by acquiescence, ripen into the use of the whole stream for commercial purposes.   See Western U. Tel. Co. v. Syracuse El. L. & P. Co., 178 N. Y. 338, 70 N. E. 866; Penrhyn Slate Co. v. Granville Co., supra.

There is ample evidence in this case to show that at any time in low water, with the present construction of the outlet from said creek, the whole of the stream can be diverted and carried into the defendant's pond; and, if the season were an unusually dry one, continuing until winter comes, the defendant might monopolize and use the whole stream, to the injury and disadvantage of the plaintiff. This misfortune ought to be prevented if possible. The plaintiff is entitled to the natural flow of the water of said stream at all times, within the limits suggested, and he should not be deprived of those rights; nor should he be made to take the hazard of permitting the diversion of the stream to ripen into an acquired and permanent right. The plaintiff must therefore have a judgment restraining the defendant from diverting and using said stream, or permitting the same to be diverted and used, for commercial purposes, with damages against the defendant, which are hereby assessed at $100, besides the costs and disbursements of this action.

Judgment is ordered accordingly.

---

(103 App. Div. 282.)

CONTINENTAL INS. CO. et al. v. NEW YORK & H. R. CO. et al.

(Supreme Court, Appellate Division, First Department.   April 7, 1905.)

1. CORPORATIONS—CONTRACTS—RATIFICATION BY STOCKHOLDERS—RIGHTS OF MINORITY.

Where a contract between two corporations, made by the directors, several of whom were common to both corporations, was ratified by a majority of the stockholders of each, it could not, in the absence of any proof that it was calculated to defraud the minority stockholders, be set aside at their suit.

2. SAME—VOIDABLE CONTRACT—RESCISSION.

A voidable contract made by a corporation cannot be rescinded by a minority of the stockholders.

Appeal from Judgment on Report of Referee.

Action by the Continental Insurance Company and others against the New York & Harlem Railroad Company and another. From a judgment for defendants, plaintiffs appeal. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, INGRAHAM, and LAUGHLIN, JJ.

John G. Milburn, for appellants.
William B. Hornblower, for respondents.

INGRAHAM, J. This action was originally brought by the Continental Insurance Company, as a stockholder of the New York & Harlem Railroad Company, on behalf of itself and all other stockholders of the Harlem Company similarly situated. Subsequently, by orders of the court, other stockholders of the Harlem Company were made parties plaintiff, so that at the time of the trial the plaintiffs were

the owners of 10,150 shares of the stock of the Harlem Company. The total stock of the Harlem Company is $10,000,000, divided into 200,000 shares; the plaintiffs representing a little over one-twentieth of the stock of the company. The action was brought to have declared null and void an agreement made between the New York & Harlem Railroad Company and the New York Central & Hudson River Railroad Company; the plaintiffs, as stockholders, seeking to enforce a cause of action vested in the corporation; the directors, after a request by the plaintiffs, having refused to commence this action.

To entitle the plaintiffs to any relief in this action, they were required to show that a cause of action existed in favor of the New York & Harlem Railroad Company to set aside the agreement, and to have it declared null and void. There is no claim that this agreement was ultra vires of the corporation. The claim of the plaintiffs seems to be based upon the fact that a majority of the directors of the Harlem Company were also directors of the Central Company, and that this agreement should be declared void because of the fact that a majority of the directors of each of the contracting companies were directors of both companies. It is not alleged that the Harlem Company, either by its directors or by a majority of its stockholders, has elected to rescind this agreement; but the plaintiffs, owning about one-twentieth of the stock of the Harlem Company, have elected to rescind the contract; the other nineteen-twentieths of the stockholders of the company having refused or failed to join with the plaintiffs in their attack upon this agreement, and having accepted its advantages by the receipt of dividends paid by the Central Company to the stockholders of the Harlem Company under its provisions.

The complaint contains allegations tending to show bad faith on the part of the directors in both corporations. It is sufficient to say that all of these charges, so far as they reflect upon the integrity of any of these gentlemen, were not only not sustained by a particle of evidence offered on behalf of the plaintiffs, but that the evidence disproved all of these allegations. Each of these gentlemen, with one exception, was interested more largely in the Harlem Company than in the Central Company, and would have profited individually to a much greater extent if the contention of the plaintiffs could be sustained. The case was tried by a referee who for many years has occupied a very distinguished position in the judiciary of this state, and he has rendered an extremely able opinion, in determining that the plaintiffs had no cause of action; and it would not be necessary for us to say anything further in disposing of this appeal than was said by him, but that we prefer to place our judgment upon the binding effect on the minority stockholders of the action of a majority of the stockholders approving the agreement that was made, and directing the directors and officers of the corporation to execute it on its behalf. To present this question, it is necessary to state the relations that existed between these two corporations and the precise question that was presented to them when this agreement was approved by the stockholders of the two companies:

The Harlem Company was organized to operate a steam railroad in the state of New York, and the Central Company was organized to operate a railroad between New York and Buffalo, in the state of New

York. Prior to the year 1873 these two companies were operating their several lines of railroad, and on April 1st of that year there was executed and delivered an agreement, a copy of which is annexed to the complaint, by which the Harlem Company leased to the Central Company its railroad, extending from Forty-Second street, in the city of New York, to Chatham Four Corners, a distance of about 130 miles, for a period of 401 years from the 1st of April, 1873; the Central Company to pay as rent for the demised premises $2 upon each share of the capital stock of the Harlem Company on the 1st day of July and the 1st day of January in each year (the said amount being equal to 8 per cent. per annum on the par value of the said capital stock); to pay the interest on the bonds of the Harlem Company that were described in a schedule annexed to the lease, as such interest should from time to time become due and payable; and to pay the rent agreed to be paid by the Harlem Company to a railroad called the New York & Mahopac Railroad Company, according to the terms and conditions of the lease of that road to the Harlem Company; and to pay all taxes, charges, and assessments that might be imposed or assessed in any way on said railroad, branch, or property, or any part thereof. This lease also contained a provision that the authorized capital stock of the company was $10,000,000, and no more, consisting of 200,000 shares, of the par value of $50 per share; and the Harlem Company covenanted that the schedule annexed to the lease contained a full and correct statement of its outstanding bonds, and, as some of those bonds had not been issued, it was agreed that the unissued bonds should be delivered to the Central Company, to be disposed of by it as provided for in the agreement; the agreement to pay interest on these bonds to apply to the bonds then unissued, and which would be delivered to the Central Company. The lease also contained a covenant on behalf of the Harlem Company that it would not, during the continuance of the contract, "authorize, create or issue any stock or bonds additional to the amounts thereof respectively now authorized or outstanding, as hereinbefore stated, except at the request or upon the demand of the said party of the second part, as hereinafter set forth." The Central Company also agreed to pay the principal of all the bonds described in Schedule A, other than the bonds therein described as "Consolidated Mortgage, due May 1, 1900," as they shall respectively mature and be presented for payment—

"And that it will, at the maturity thereof, pay the principal of the said 'Consolidated Mortgage' bonds if, and in case, it should not be paid by the party of the first part [Harlem Company]. In case of the payment thereof, or of some or any part thereof by the said party of the first part, then, and in that event, the said Party of the second part [Central Company] shall, thereafter, pay to the said party of the first part, semiannually, on the days when interest would become due and payable on said bonds, if the time thereof had been extended, an amount equal to such interest on said bonds, or on such part of them as may have been paid by the said party of the first part, so as fairly to adjust the obligation of the said party of the second part, herein contained, as to the annual rent on the said railroad and property herein demised. In case, however, the said 'Consolidated Mortgage' bonds shall be paid by the said party of the second part, the said party of the first part agrees that it will, whenever requested by the said party of the second part so to do, issue in lieu thereof new bonds bearing a similar rate of in-

terest, or such other rate as may be agreed upon, with, so far as may be required, proper coupons or interest warrants therefor appended, and secured by a suitable mortgage upon the railroad property and franchises hereby demised; such bonds to be payable at such time or times, and to such person or persons as may be prescribed by the said party of the second part; and will deliver such new bonds to the said party of the second part, to be sold or disposed of in its discretion; in which case the obligation of the said party of the second part herein contained, with regard to the payment of interest on the said 'Consolidated Mortgage' bonds shall be deemed and held to apply to interest on such new bonds."

This lease also contains a provision that the party of the second part may at any time during the continuance of the demised term change and alter the line, way, and gauge of the said demised road or branch, and, on so doing, may discontinue any part of the present way or track of said road or branch, and any of the machine shops or depots required for the use of the line, and may also change the grade or grades of the road, or alter or change the location of any of the tracks, etc., and may purchase and acquire title to any additional real estate for the use of said road, or may exchange its lands or buildings for any other lands more convenient or necessary for its use, and of equal value for the uses and purposes of the said road; but all such alterations, changes, purchases, or exchanges are to be made at the proper cost and charge of the party of the second part; and the party of the second part, its successors and assigns, may also from time to time, during the continuance of the said term, sell and dispose of such part of the demised premises and property as may not be necessary for the use of the said demised railroad and branch; and the party of the first part, its successors and assigns, shall, in case of any such sale or exchange, and upon the demand in writing of the party of the second part, at any time, and from time to time, execute a good and sufficient deed, but without covenants or warranty of title, of any part of the said premises which the party of the second part, its successors or assigns, may so agree to sell or exchange as aforesaid to the purchaser or the party with whom the exchange shall be made; and the Central Company covenanted to account and pay over to the Harlem Company the consideration money received for any portion of the lands demised, which, having been found not necessary for the use of the demised railroad and branch, may have been disposed of absolutely, except such as may have been exchanged for other lands of equal value, but no interest was to accrue on such consideration money during the continuance of the contract. By the schedule annexed to the lease, it appeared that the consolidated bonds, the payment of interest on which was assumed by the Central Company, became due April 1, 1900, and the interest thereon was 7 per cent. per annum. All of the other bonds of the Harlem Company were to be paid by the Central Company at maturity. This obligation the Central Company performed, leaving the only indebtedness of the Harlem Company outstanding $12,000,000.

Since the execution of that lease, the Central Company has been in possession of the Harlem Road, operating it as a part of the Central System, paying the rents reserved, and complying with the obligations and conditions of the lease. These $12,000,000 of bonds

were secured by a mortgage upon the Harlem Road issued prior to the execution of the lease, and the lease of the Central Company was therefore subject to this mortgage. About the year 1896 the question of the payment of these consolidated mortgage bonds was considered by the directors of both corporations, and it was realized that as they became due, on May 1, 1900, provision had to be made for their payment. Since the execution of this lease the rate of interest at which railroad bonds of this character could be sold had been materially reduced, and it was ascertained that bonds of the Harlem Company secured by a mortgage could be sold at a rate of interest much lower than that theretofore paid upon these consolidated bonds, and a question was then presented as to the rights of the respective parties to the amount represented by this saving of interest on the bonds. A prominent firm of bankers in New York were willing to purchase from the Harlem Company bonds secured by a mortgage upon its road, with interest at $3\frac{1}{2}$ per cent.; thus saving in interest the difference between $3\frac{1}{2}$ and 7 per cent. per annum, or $420,000 per year. Mr. Henry H. Anderson, a prominent member of the New York bar, who had been for many years the legal adviser of the Harlem Company, was requested by it to give his opinion as to the construction to be given to the lease; and in pursuance of that request, on March 17, 1896, he addressed a communication to the president of the Harlem Company, stating as his opinion that, under the provisions of the lease, as the Harlem Company was prevented from issuing any mortgage or incumbrance upon the demised property, except at the request of the Central Company, it was prevented from issuing bonds secured by a mortgage to take up the consolidated bonds, while, under the lease, if it could pay off this consolidated mortgage without issuing any mortgage upon the demised property, it was at liberty to do so, in which event it would be entitled to receive the $840,000 per year interest that the Central Company had been paying upon the consolidated bonds; that under the lease the Central Company could, when it paid off these consolidated mortgage bonds, call upon the Harlem Company to issue bonds secured by a mortgage to take the place of the paid bonds, in which event the Central Company would be entitled to the bonds so issued, and, upon using such bonds to pay off the consolidated bonds, the obligation of the Central Company would be to pay the interest on such substituted bonds. This opinion of Mr. Anderson's was communicated to the Harlem Company, and in the meantime, on April 8, 1897, the Harlem Company had received a proposition from Messrs. J. P. Morgan & Co. and J. S. Morgan & Co. to purchase $12,000,000 of their new bonds, payable in 100 years, and to bear interest at $3\frac{1}{2}$ per cent. per annum; such bonds to be secured by a mortgage on all the property and franchises of the company, excepting its city lines; it being understood that the new bonds and mortgage were to be subject to the approval of the counsel for the bankers. J. P. Morgan & Co. and J. S. Morgan & Co. at the same time made the same proposition to the Central Company in respect to the bonds of the Harlem Company in case the Central Company should be entitled to the bonds.

On the 14th of April, 1897, at a meeting of the directors of the Harlem Company, a resolution was passed which recited the lease between the Harlem Company and the Central Company, authorizing the president or officers of the Harlem Company to make a contract for the sale of the $12,000,000 bonds, and to accept the proposition of the firms of J. P. Morgan & Co. and J. S. Morgan & Co. to purchase the bonds, and directing that a stockholders' meeting be called to approve of such bonds, and the mortgage to be given to secure their payment, which approval was subsequently given by the stockholders. On the 18th of May, 1897, a meeting of the directors of the Central Company was called, and this action of the Harlem Company was presented to that meeting, whereupon the directors of the Central Company passed a resolution that the Central Company would pay these consolidated mortgage bonds at maturity, and calling upon the Harlem Company, under the terms of the lease, to make a new mortgage on the railroad property, and to deliver the bonds secured thereby to the Central Company; and it was also resolved that the general counsel of the company be directed to retain and associate with him Ashbel Green and Edward J. Phelps for the purpose of beginning and prosecuting such action or actions as might be necessary to secure and protect the rights of the company; and notice of this action was given to the Harlem Company. Prior to this meeting there had been communicated to the president of the Central Company an opinion signed by Frank Loomis, the general counsel for the Central Company, Ashbel Green, and E. J. Phelps, which construed the lease as giving to the Central Company the right to require the Harlem Company to execute and deliver to the Central Company new bonds secured by a mortgage on the same property, and that the Harlem Company had no right to issue bonds secured by a mortgage upon the demised property, and had no right to require the Central Company to pay the 7 per cent. upon the $12,000,000 of the consolidated mortgage bonds. Mr. Stetson, whose opinion as to the construction of the lease had been asked, had written a letter to Mr. Twombly, stating that, under his construction of the lease, the Harlem Company had a right to issue bonds to the extent of $12,000,000, secured by a mortgage upon the demised property, and with the proceeds thereof to pay off the consolidated mortgage bonds, and that the Harlem Company would then be entitled to demand of the Central Company 7 per cent. upon the sum of $12,000,000 in each year; and this opinion had been communicated to the directors of the Harlem Company, and they had acted upon it in authorizing the bonds to be issued to take up the consolidated bonds.

This being the situation, on the 29th of June, 1897, an action was commenced in the Supreme Court by the Central Company against the Harlem Company to have a judicial determination of the questions between the two companies. An answer was interposed in that action, and the case was noticed for trial on the first Monday of November, 1897. This action appeared on the day calendar for the 16th of May, 1898, but was adjourned until the October term. Thus on the 1st of May, 1900, $12,000,000 had to be provided for the pay-

ment of these consolidated bonds by the Harlem Company. The action to have a determination as to the rights of the respective parties under this lease had not been tried in the summer of 1898, and it was evident that this question could not be settled by a decision of the appellate courts prior to the time when the bonds would become due. The directors of the two companies had then to determine whether it would not be advisable in some way to adjust the differences by a compromise. The referee has found, upon evidence which is not substantially disputed, that both parties to this dispute acted in entire good faith in making the claim that they did, and has also found that there was a serious question as to which of the respective claims would be sustained. He has expressed his opinion that, upon a proper construction of the agreement between the respective companies, the contention of the Harlem Company was right, and would have been ultimately sustained. But however that may be, the offer to purchase the bonds of the Harlem Company was conditioned upon that company's securing its bonds by a mortgage upon all of its property that had been demised to the Central Company, which would be a first lien upon that property. Now, it is apparent that the Harlem Company could make no new mortgage upon its property without the consent of the Central Company, except subject to the lease to the Central Company, and subject to the right of the Central Company to sell portions of the demised property; and it would seem that, assuming that the Harlem Company had the right to make a mortgage, and to secure bonds that it had issued to take up the consolidated mortgage bonds, as that mortgage would have to be subject to the lease of the Central Company, the condition of the bankers, upon which they based their offer to purchase the Harlem bonds, could not be strictly complied with by the Harlem Company. Whether that would have affected the ability of the Harlem Company to sell its bonds does not appear from the record; but reading the fifth, sixth, sixteenth, and seventeenth clauses of the lease together, there certainly was presented a question that was not free from doubt—as to which corporation was entitled to the saving of any interest which resulted from the refunding of these consolidated bonds— and the opinion given by the eminent counsel employed by the different companies, the good faith of which cannot be questioned, justified each of the companies in insisting upon the construction of the lease that it had been advised by its respective counsel was correct.

This being the situation, at a meeting of the directors of the Central Company held on June 22, 1898, a resolution was adopted that recited the dispute between the respective companies, and the pendency of a suit to determine that dispute, and that it was the opinion of the board of directors that it was for the best interest of the company and the stockholders that there should be an amicable adjustment of the differences, and a committee was appointed to negotiate with the Harlem Company for an adjustment of the matters in controversy; and on June 28, 1898, at a meeting of the

directors of the Harlem Company, there being present eight direct-
ors, of whom three only were directors of the Central Company, a
copy of these resolutions, adopted by the directors of the Central
Company, was submitted to the meeting, and a resolution was
passed which recited that, whereas it was, in the opinion of the
directors, for the best interest of the company and the stockholders
thereof that the uncertainty of litigation should be avoided, and
that the advantage of an increase in the rental under the lease
should be secured by an amicable adjustment of the differences be-
tween the two companies, it was resolved that a committee of the
board be appointed to negotiate with the Central Company for the
adjustment of the matters in controversy between the two compa-
nies under the lease of April, 1873, and further directing that, if this
committee should reach an adjustment, it should report the same to
a meeting of the stockholders of the company, provision for a call-
ing of which was made by a subsequent resolution; and a form of
notice of this special stockholders' meeting was adopted, which
provided that a special meeting would be held "for the purpose of
submitting to the stockholders the final report of a committee ap-
pointed by the board of directors of this company to agree with
the board of directors of the New York Central & Hudson River
Railroad Company upon a settlement of the questions between the
two companies arising out of the lease of April 1, 1873, and the re-
funding of the consolidated bonds of this company, and for the
purpose of taking final action with reference to such proposed set-
tlement and agreement." In pursuance of this authority, the commit-
tees of the two boards of directors met. They came to an agreement
which was formulated into what was called a "second supplemental
contract," and which is the agreement sought to be declared void in
this action. That agreement provided that the Harlem Company
should issue its bonds, secured by a mortgage on its property, to
retire the consolidated mortgage bonds, and that the Central Com-
pany should pay to the stockholders of the Harlem Company, by
way of rental under the lease of 1873, on the 1st days of July and
January in each year, 50 cents per share on each share of the Harlem
Company's stock, being at the rate of 2 per cent. per annum in addition
to the amount of rent reserved by the lease, so that after May 1,
1900, the annual rent payable by the Central Company to the several
stockholders of the Harlem Company should be equal to 10 per
cent. on the par value of the capital of the Harlem Company; and
the Harlem Company agreed that it would not make any further
claim against the Central Company on account of the reduction of
interest on their bonds. The committees appointed by the boards of
directors of the two companies having thus agreed to a compromise
of the questions in dispute, a meeting of the stockholders of the
Harlem Company was, pursuant to the resolution of the directors,
called for the 5th of October, 1898. There was sent with the call
for the meeting to each stockholder a circular, signed by the presi-
dent of the company, which stated that the stockholders would re-
ceive a notice of a meeting of the stockholders to be held on Mon-

day, October 5, 1898, for the purpose of considering the final adjustment. and settlement of the differences between the Harlem Company and the Central Company, growing out of the contract of lease of April 1, 1873 ; that arrangements had been made by which there would be a saving of interest on these bonds of $420,000 per annum; that counsel for the Central Company had advised that the Central Company was entitled to all of the interest saving effected by the refunding of the Harlem debt, and that on the side of the Harlem Company it was claimed, with the support and under the advice of competent counsel, that the Harlem Company was entitled to the whole of the interest saving; that a litigation was then pending to determine that question, and the boards of directors of the respective companies had reached the conclusion that the common advantage would be promoted, were each company to make a compromise. It was then stated that committees had been appointed by each company, and that they had reached the conclusion that it would be fair to adjust and settle the differences by adding 2 per cent. to the annual dividend to be received by the Harlem stockholders, who thus would receive after May 1, 1900, under the lease, and exclusive of their interest in the street railway property, annual dividends of 10 per cent. instead of 8 per cent., as prior to that date; that this was $10,000 less than one-half of the entire interest saving; and that the board of directors of the Harlem Company regarded that adjustment and settlement as desirable, and it was respectfully recommended to the acceptance and approval of all Harlem stockholders at their meeting which had been called for October 5th. This circular was signed by the president of the company, with a statement that a copy of the proposed second supplemental agreement which embodied this proposed compromise could be obtained on application at the office of the company.

This meeting of the stockholders of the Harlem Company was held on the 5th of October, 1898. There were represented at that meeting 157,561 shares of the capital stock of the corporation, out of the total capital of 200,000 shares. The resolution of the board of directors of June 28, 1898, and the proceedings of the meeting of the committee of the directors of the Harlem Company with the committee appointed by the Central Company, and a draft of the proposed supplemental contract between the two companies, as approved by the two committees, were presented to the stockholders; and thereupon a resolution was submitted that the stockholders of the Harlem Company approved the resolution of the board of trustees and of the committee appointed under said resolution, adopted in joint session with a similar committee of the Central Company held the 10th day of August, 1898, and authorizing the board of directors and the proper officers of the Harlem Company, and under its corporate seal, to make, execute, and deliver to and with the Central Company, and to perform, the second supplemental contract, modifying and amending the provisions of the contract of lease of April 1, 1873, substantially as set forth in the printed draft of contract submitted to the meeting which approved of the form and provisions of the said supplemental contract. There

was objection made to the adoption of this resolution by the holders of about 10,000 shares of the stock of the company, and also by Mr. Trull, representing the original plaintiff in this action. A motion was made by a stockholder that the meeting be adjourned until December 7, 1898, which was submitted to the stockholders, and was defeated. The polls, therefore, were declared open, to remain open until 2 o'clock p. m., to vote upon the resolution for the approval of this supplemental contract, and, as a result of that poll, 146,519 shares of the capital stock of the company voted in favor of the resolution; 11,042 shares voting against it, and 42,439 shares not voting. In pursuance of this vote of the stockholders, the officers of the company executed the supplemental agreement which had thus been approved. Under it the new bonds to take the place of the consolidated bonds were duly issued, and the consolidated bonds were retired. The Central Company has paid to the stockholders of the Harlem Company a dividend of 2 per cent. a year in addition to the dividend required to be paid by the lease of 1873, and this dividend has been received by all, or substantially all, of the stockholders of the company, except the plaintiffs in this action.

There is not presented by this record a particle of evidence that any fraud was practiced upon the stockholders of the Harlem Company, that they were not fully cognizant of the question that was to be submitted to them, that any stockholder who voted to approve this supplemental agreement was misled in any way, or that any of the stockholders who voted in favor of the agreement desired to retract or change their vote upon this question, or now wish to avoid the agreement. The result of this agreement is to increase the dividends upon the stock of the Harlem Company 2 per cent. per year. If this agreement should be avoided, the question as to whether the Harlem Company was entitled to any increase would be opened, and the result might be that these stockholders would now lose the additional dividend. The court is asked by the holders of one-twentieth of the stock of the company to take away from the holders of the remaining nineteen-twentieths of the stock the benefits accruing to them under the agreement. If we should assume that any action of the board of directors in making this compromise would have been void without the consent of the stockholders, there was nothing to prevent the stockholders of the company from making the agreement; and, when a majority had approved it, no principle justified the court, at the request of a minority of the stockholders, in overriding the majority as to the advantages to the corporation and the stockholders by its adoption.

The Presiding Justice of this court, in Met. Elev. Ry. Co. v. Man. Ry. Co., 14 Abb. N. C. 103, elaborately discussed the consequences resulting where contracts are made between two corporations with common directors, and, after a most thorough examination of the authorities, his conclusion is thus stated:

"The principle is here recognized that the majority of the shareholders may ratify a lease made by the directors and that a minority cannot disaffirm; that therefore it must be the majority of the shareholders, acting

through the corporation, who repudiate, and no shareholder has the power to exercise that right against the will of the majority."

And further, in speaking of the right to disaffirm such a contract, he said:

"It is urged against this rule that, if common directors are disqualified from acting, so are common shareholders incompetent to ratify agreements between their companies, and that the holders of one share of stock in each of the companies could prevent any action at a shareholders' meeting relating to the two companies, no matter how advantageous such action might seem to the holders of every other share of stock. I do not say that the disqualification extends to a shareholder. I can see no reason why it should. The disability rests entirely upon the fiduciary relationship. A shareholder is trustee for nobody. He has only his own interests to look after, as such shareholder, closely connected, as they undoubtedly are, in practice, with the interests of the other shareholders. But he holds no such fiduciary relation to the corporation as pertains to the office of director. And I think that it is carrying the rule to a much greater length than the reasons which have given it existence require."

In Gamble v. Q. C. W. Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527, the Court of Appeals discusses the question as to the circumstances under which minority stockholders of a corporation can maintain an action in equity to rescind the act of a majority. In speaking of the right of the majority stockholders at a meeting of the stockholders upon a proposition submitted to the meeting, the court say:

"A shareholder has a legal right at a meeting of the shareholders to vote upon a measure, even though he has a personal interest therein separate from other shareholders. In such a meeting each shareholder represents himself and his own interests solely, and he in no sense acts as a trustee or representative of others. The law of self-interest has at such time very great and proper sway. There can be little doubt, too, that at such meetings those who do vote upon their own stock vote upon it in the light solely of their own interest, or at least in what they conceive to be their own interest. Their action resulting from such votes must not be so detrimental to the interests of the corporation itself as to lead to the necessary inference that the interests of the majority of the shareholders lie wholly outside of, and in opposition to, the interests of the corporation and of the minority of the shareholders, and that their action is a wanton or fraudulent destruction of the rights of such minority. In such cases it may be stated that the action of the majority of the shareholders may be subjected to the scrutiny of a court of equity at the suit of the minority shareholders."

And the case of N. W. T. Co. v. Beatty, L. R. 12 App. Cas. 589, is cited with approval. There, in considering a contract made between a director and the corporation, it was admitted to be voidable. It was, however, held that the vendor director had a right at a meeting of the shareholders to vote in favor of ratifying such contract and concluding such purchase, and that his conduct was not to be regarded as oppressive towards the minority of shareholders because he individually owned a majority of the stock; and the court says:

"To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interest, but that he must have acted with an intent

to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."

In the Gamble Case the corporation made a contract with Mullins, who controlled a majority of the stock of the corporation, by which he undertook to build an extension of the company's works, to be paid in stock and bonds of the company; and, in an action brought to restrain the carrying out of that contract, it was held that the court was not justified in granting such relief, where a majority of the stock had approved the contract, although Mullins, who had an interest in the contract, and who controlled the corporation, had voted in favor of the contract. On the other hand, an instance in which a court would interfere at the suit of a minority stockholder was presented in the case of Farmers' L. & T. Co. v. N. Y. & N. R. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689. That was an action to foreclose a mortgage upon the New York & Northern Railway Company. The New York Central Railroad Company had purchased a majority of the stock and bonds of this company, and had thus obtained control of the directors. There was default in payment of the bonds, and an action was commenced to foreclose the mortgage. The answer set up as a defense that the Central Railroad had acquired a majority of the stock, to secure its property, through a foreclosure of the mortgage for its own benefit, at a price much less than its true value; that this was rendered possible by its acquiring a majority of the stock of the company, thereby being able to control the affairs of the company, and to manage its business in collusion with its directors and officers, so that its obligations could not be met, or its default made good; that such acts on the part of the New York Central Railroad Company were fraudulent, and prohibited by the laws of the state. Upon the trial of the action the defendant offered evidence to prove this allegation, which was excluded by the court. This was held as error, and it was also held error for the trial court to refuse to find facts which tended to sustain this defense, which had been proved without contradiction; and the rule in regard to the obligations of a majority of the stock to the minority is thus stated:

"That any person or corporation authorized to do so might have purchased the bonds of the New York & Northern Railway Company, and have rigorously enforced them by a sale of its property, there can be no doubt. They might also have purchased the stock of the company, and thus have become the owners of both, and, while such owners, might have enforced the liability of the company upon its bonds, so long as they acted in good faith and their purpose was proper; but, when the New York Central & Hudson River Railroad Company purchased the stock and bonds in question, thus obtaining a controlling interest in the affairs of the New York & Northern Railway Company, for the avowed purpose of destroying it, to serve a purpose entirely outside of that for which it was organized, and in hostility to it, it becomes clear that, as such stockholder, it owed a duty to the minority stockholders; that the law implied a quasi trust upon its part; and that a court of equity will not aid in the destruction of that corporation and a confiscation of its

property, although it held a majority of its stock and the required amount of its bonds."

In Flynn v. Brooklyn City R. Co., 9 App. Div. 269, 41 N. Y. Supp. 566, Mr. Justice Cullen, delivering the opinion of the court in an action brought by a minority of stockholders to set aside a lease of a railroad executed by the company of which he was a stockholder to another company, and which lease had been approved by a majority of stockholders of the company, said:

"But the plaintiff is one of very many stockholders in the company—one of many interested in a common enterprise. In the management of that enterprise, so far as its conduct is authorized by law, not his will or judgment, but the will and judgment of the majority, must control, even though he should be right, and the majority wrong in their judgment."

And then, after citing from Gamble v. Queens County Water Co., supra, the learned judge continued:

"As already stated, the action of the Brooklyn City Railroad Company in leasing its road was within its corporate powers, and it cannot be said that the action of the stockholders in leasing their road at ten per cent. per annum, with the guaranty and privilege above recited, was 'so far opposed to the true interest of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests.'"

This case was affirmed by the Court of Appeals (158 N. Y. 493, 53 N. E. 520), where the court, after stating the general rule that courts have nothing to do with the internal management of business corporations, and that whatever may lawfully be done by the directors or stockholders, acting through majorities prescribed by law, must of necessity be submitted to by the minority, for corporations can be conducted upon no other basis, said:

"Corporate elections furnish the only remedy for internal dissensions, as the majority must rule so long as it keeps within the powers conferred by the charter. To these general rules, however, there are some exceptions, and the most important is that founded on fraud. * * * Action on the part of directors or stockholders, pursuant to a fraudulent scheme, designed to injure the other stockholders, will sustain an action by the corporation, or, if it refuses to act, by a stockholder in its stead, for the benefit of all the injured stockholders. * * * When a contract founded in fraud is executed by the directors with a third party upon the express approval of a required number of stockholders, with the intention on the part of all concerned to defraud the nonassenting stockholders, and the scheme will naturally result in serious injury to them or to the corporation, a court of equity will set aside the fraudulent transaction and compel the delinquent parties to account."

There is thus presented the distinction between the cases in which a minority stockholder can and cannot have the execution or performance of a contract, which the corporation has the power to make, enjoined, when approved by a majority. A determination by the majority is binding upon the minority of the stockholders unless there is evidence that the act complained of was ultra vires or fraudulent, so that there was an intention of all concerned, including the majority of the stockholders, to defraud the nonassenting stockholders or the corporation, and that the scheme would result in a serious injury to them or to the corporation. To justify the interference of a

court of equity, the majority of the stockholders must have been parties to a fraud which would result in an injury to the corporation or the minority stockholders. In this case, there is no evidence from which an inference can be drawn that the majority or one of the stockholders who voted to approve this agreement was influenced by any motive except to do what was considered for the benefit of the corporation, by accepting a compromise which would be for its advantage, or that the compromise was approved by the stockholders in pursuance of any scheme or device to cheat or defraud the Harlem Company or the minority of the stockholders; and, in the absence of such evidence, it was not within the province of a court of equity, at the suit of a minority stockholder, to determine whether its judgment agreed with the minority or with the majority. The learned referee has found that there was no fraud in the transaction, and that finding necessarily resulted from the evidence. But if it could be said that for any reason the contract was voidable, it certainly cannot be claimed that from anything that appears in this record it is void. Who, then, is to elect to rescind? It must be the corporation, who made the contract, or the majority of the stockholders, who approved and authorized it. Certainly a minority of the stockholders cannot act for the corporation, and rescind a contract authorized by the majority. The court has not power to rescind for the corporation. To rescind, there is needed the affirmative act of the corporation or its stockholders. In this case it is the minority that seeks to rescind against the wishes of the majority.

The learned counsel for the plaintiff insisted upon the argument that there was no consideration for this agreement. This is based upon an assumption that the claim made by the Central Company was made in bad faith, and for the purpose of being the foundation for a compromise, and that there was no real question involved as to the right of the Harlem Company to all of the money saved by the refunding of the bonds, and no real question in controversy between the two corporations. But this proposition cannot for a moment be sustained. That the eminent legal gentlemen who furnished opinions in favor of the Central Company should have expressed an opinion contrary to their views upon the construction to be given to this lease, for the purpose of creating a situation upon which a compromise could be had, is not sustained by a particle of evidence. A consideration of the lease itself satisfies us that the question was one of doubt, which might have resulted in a determination adverse to the Harlem Company. All of the evidence shows that there was a real question, which was insisted upon in good faith by the directors of both companies, and one that was eminently proper to be adjusted by a compromise. The relinquishment by the Central Company of its claim to be entitled to retain the whole of this interest was an ample consideration for the execution of the compromise agreement, and, upon this record as it stands, I think that the compromise was a fair one, and was for the benefit of the stockholders of the Harlem Company.

I think, therefore, that there was no justification for the interference of a court of equity; that the action of the stockholders of

the company in ratifying this agreement, and directing the officers of the company to execute it, was valid; and that the defendants were entitled to judgment.

It follows that the judgment appealed from must be affirmed. with costs. All concur.