Continental Insurance Company et al., Appellants, *v.* The New York and Harlem Railroad Company et al., Respondents.

1. Corporations — Agreement Between Two Railroad Corporations Compromising Dispute as to Which Was Entitled to Saving in Interest Arising from Refunding Operations. In an action brought by minority stockholders of the New York and Harlem Railroad Company (the company upon request having declined to bring it) to have declared null and void a compromise agreement made with the New York Central Railroad Company with respect to a division of the amount of interest saved by the refunding of the bonded indebtedness of the Harlem Company at a lower rate of interest, both parties having claimed to be entitled to the whole amount, it appeared that the dispute between

15

the companies arose over the construction of the terms of a lease of the Harlem railroad to the Central Company; eminent counsel differed in their construction; a suit had been instituted by the Central Company and also by a stockholder of the Harlem Company to determine the questions involved; under these circumstances an amicable adjustment of the controversy was deemed advisable, and the directors of each of the contracting parties, a majority of whom were directors of both companies, entered into the agreement in question, substantially dividing the amount saved in interest between the two companies; the agreement was thereafter ratified by the stockholders of both companies; notwithstanding the ratification the agreement was not executed by the Harlem Company until the Central Company upon demand had indemnified the former for its action; thereafter the Central Company discontinued its suit and secured a discontinuance of the stockholders' suit by transferring certain stock to the plaintiff therein; it was affirmatively found that the dispute between the two companies was an honest one and was in good faith compromised and "that there was no combination, conspiracy, and no fraud." *Held,* that although by the terms of the original lease the Harlem Company was entitled, if it could procure the necessary funds, to pay off the bonds and secure to itself any advantage in the reduction of interest arising from a new loan, that nevertheless the compromise agreement was binding on both parties thereto and concluded the rights of the plaintiffs.

2. COMPROMISE AGREEMENT VOIDABLE, NOT VOID. Assuming that the fact that the majority of the directors of the Harlem Company were directors of the Central Company rendered the agreement voidable at the election of the Harlem stockholders, it was not absolutely void, and having been ratified by them, became binding upon the company.

3. WHEN MINORITY STOCKHOLDERS NOT ENTITLED TO MAINTAIN ACTION. The right to avoid the agreement, however, rested in the Harlem Company, not in minority stockholders, unless the ratification thereof was dictated by fraud or was procured by concealment and in ignorance of the true state of the facts, which it was affirmatively found was not the case here.

4. APPEAL — STIPULATION AS TO EVIDENTIARY FACTS DOES NOT ENABLE COURT OF APPEALS TO CONSIDER FINDINGS UNANIMOUSLY AFFIRMED. Whatever may be the force of a contention that the existence of issuable or traversable facts having been stipulated by the parties on the trial, the Court of Appeals is bound to accept and consider them, notwithstanding the findings have been unanimously affirmed by the Appellate Division it is not applicable to merely evidentiary facts, not necessary to allege or plead, but constituting only evidence from which the issuable or traversable facts can be determined, especially in a case where all the stipulated facts fail to establish fraud or misconduct on the part either of the directors or of the majority of stockholders.

5. ACTION OF COMMON DIRECTORS OF THE TWO CORPORATIONS. That the common directors of the two corporations asserted the rights of each, as the occasion required, is not a proper ground for criticism, that being the right thing to do.

6. WHEN CIRCULAR ALLEGED TO HAVE BEEN MISLEADING CANNOT AFFECT RESULT. A contention that a circular issued to stockholders calling the meeting to act on the proposed compromise agreement was misleading and insufficient is without force when not a single stockholder voting for the ratification has complained that he was misled or has sought to repudiate his action, where the controversy was of long duration and some public discussion and the plaintiffs at all times knew the exact situation.

7. SETTLEMENT OF LITIGATION DOES NOT ESTABLISH FRAUD. A settlement by the Central Company of the Harlem stockholders' suit and the exaction of indemnity by the Harlem Company, while showing that both companies were fearful of litigation, does not establish fraud.

8. SUFFICIENCY OF VOTE RATIFYING AGREEMENT. Assuming that the compromise agreement was in effect a new lease to be executed with the same formalities and vote as in the case of the original lease, under chapter 433 of the Laws of 1893, the vote of the Central Company's stockholders was sufficient, two-thirds of the stock voted upon at the meeting being cast in favor of the lease.

*Continental Ins. Co.* v. *N. Y. & H. R. R. Co.*, 103 App. Div. 282, affirmed.

(Argued December 4, 1906; decided January 15, 1907.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April 20, 1905, affirming a judgment in favor of defendants entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Alton B. Parker, William C. Trull* and *Charles E. Miller* for appellants. The Harlem Company had the right to issue the new bonds secured by a mortgage on its reversionary interest in the leased property, and to devote the proceeds of those bonds to the payment of the consolidated mortgage bonds at maturity. The second supplementary contract, therefore, was without consideration and void. (*Feeter* v. *Weber*, 78 N. Y. 334; *Farmers' Bank* v. *Blair*, 44 Barb. 641; *Miles* v. *Estate Co.*, L. R. [32 Ch. Div.] 266; *Sullivan*

v. *Collins*, 18 Iowa, 228; Pollock on Cont. 161.) The second supplementary contract is invalid for the reason that it was formulated, promoted and authorized in behalf of the Harlem Company, by directors of that company, a majority of whom were directors of the Central Company. (Morawetz on Corp. § 528; *N. Y. C. Ins. Co.* v. *Nat. Ins. Co.*, 14 N. Y. 85; *Voltz* v. *Blackmar*, 64 N. Y. 440; *Pearson* v. *C. R. R. Co.*, 62 N. H. 537; *Fitzgerald* v. *F. & M. C. Co.*, 44 Neb. 463.) The legal inferences which naturally flow from the referee's findings establish that the acts of the common directors in planning and authorizing the second supplementary contract amounted to constructive fraud. (*Bosworth* v. *Allen*, 168 N. Y. 157.) The second supplementary contract is so unjust and unfair in its provisions and so manifestly in the interest of the Central Company and against the interest of the Harlem Company, that, having been authorized by directors of the Central Company, who were at the same time directors of the Harlem Company, it is voidable at the suit of the plaintiffs. (2 Cook on Corp. § 658; 3 Thomp. on Corp. § 4079; Morawetz on Corp. § 528; *Munson* v. *S. G. & C. R. R. Co.*, 103 N. Y. 58; *Met. Elev. Co.* v. *Man. El. Co.*, 11 Daly, 373; *Burden* v. *Burden*, 159 N. Y. 287; *Barr* v. *N. Y., L. E. & W. R. R. Co.*, 52 Hun, 555.) The vote of the stockholders of the Harlem Company in approval of the second supplementary contract is no obstacle to the maintenance of this action. (*Sage* v. *Culver*, 147 N. Y. 241; *C. C. Co.* v. *Sherman*, 30 Barb. 553; *Gilman, C. & S. R. R. Co.* v. *Kelly*, 77 Ill. 426; 2 Cook on Stock & Stockh. 945, § 662; *Gamble* v. *Q. C. W. Co.*, 123 N. Y. 91; *Crichton* v. *W. P. Co.*, 36 South. Rep. 926; *Jacobus* v. *A. M. W. M. Co.*, 38 Misc. Rep. 371; 94 App. Div. 366; *C. H. C. Co.* v. *Yerkes*, 141 Ill. 320; *Ervin* v. *O. R. & N. Co.*, 27 Fed. Rep. 625; *McLeary* v. *E. T. T. Co.*, 38 Misc. Rep. 3; *Menier* v. *H. T. Works*, L. R. [9 Ch. App.] 350; *F. L. & T. Co.* v. *N. Y. & N. R. Co.*, 150 N. Y. 410.)

*William B. Hornblower, Francis Lynde Stetson, Henry B. Anderson* and *Ira A. Place* for respondents. The con-

tention that the single circumstance that a majority of the
two boards was composed of the same individuals, of itself
precludes the making of any contract between the two com-
panies and prevents the compromise agreement from having
any force or effect is absolutely at variance with the well-
settled rules of law and equity.   (2 Pars. on Cont. [9th ed.]
505, 661 ; *Dady* v. *O'Rourke*, 172 N. Y. 452; *Holmes* v.
*Hubbard*, 60 N. Y. 185.)   Even had it been true that the
compromise agreement had been adopted by a vote of the
directors of the Harlem Company, of whom a majority were
directors of the Central Company, the agreement would not,
therefore, have been invalid but merely voidable at the option
of the company, which option must be exercised promptly.
( *Wallach* v. *L. I. R. R. Co.*, 12 Hun, 463 ; *Gamble* v.
*Q. C. W. W. Co.*, 123 N. Y. 99 ; *McNaughton* v. *Osgood*,
41 Hun, 109 ; *Burden* v. *Burden*, 8 App. Div. 160 ; *Les-
lie* v. *Lorillard*, 110 N. Y. 532 ; *M. E. Ry. Co.* v. *M.
Ry. Co.*, 11 Daly, 373 ; *People* v. *R. S. & L. Assn.*,
97 App. Div. 31 ; *Burden* v. *Burden*, 159 N. Y. 287 ;
*Hart* v. *O. & L. C. R. R. Co.*, 89 Hun, 317 ; *Bev-
eridge* v. *N. Y. E. R. R. Co.*, 112 N. Y. 127.)   The
compromise agreement was ratified by an overwhelming vote
of stockholders at a meeting duly called for that purpose.
Such ratification eliminated any objection to the contract
based upon the fiduciary relationship of the directors growing
out of their common directorship in the two companies.
(*Gamble* v. *Q. C. W. Co.*, 123 N. Y. 91 ; *Hodge* v. *U. S. S.
Co.*, 54 Atl. Rep. 1 ; *N. W. T. Co.* v. *Beattie*, L. R. [12
App. Cas.] 589 ; *Burland* v. *Earle*, L. R. [1 App. Cas. 1902]
83 ; *Bjorngaard* v. *G. Co. Bank*, 49 Minn. 483 ; *S. M. M.
Co.* v. *Preston*, 17 Misc. Rep. 220 ; *Windmuller* v. *S. D. &
D. Co.*, 114 Fed. Rep. 491 ; 115 Fed. Rep. 748 ; *M. E. R. R.
Co.* v. *Man. R. Co.*, 11 Daly, 516.)   The overwhelming vote
of the stockholders in favor of the compromise was given with
full knowledge of all the material circumstances of the case
and is conclusive upon the Harlem Company, and none of
plaintiffs' objections to the same are well taken.   (*Symott* v.

*C. B. L. Assn.*, 117 Fed. Rep. 379; *P. L. Co.* v. *Green*, 7 C. P. 43; *Kelly* v. *N. H. R. R. Co.*, 141 Mass. 496; *Gale* v. *Morris*, 3 Stew. 285; *Haslett* v. *Stephany*, 55 N. J. Eq. 68; *May* v. *Chapman*, 16 M. & W. 355; *Higgins* v. *Crouse*, 147 N. Y. 411.)

CULLEN, Ch. J. In April, 1873, the defendant, The New York & Harlem Railroad Company, entered into an agreement with the defendant, The New York Central Railroad Company, whereby it demised that part of its railroad which was theretofore operated by steam power, together with the rolling stock used thereon, and which lay north of Forty-second street in the city of New York, to the latter company for the term of four hundred and one years; the lessee yielding and paying therefor to or on account of the said party of the first part (the Harlem Company) during the continuance of said demised term an annual rent to be paid as follows:

"*First.* By paying to the several stockholders in the said party of the first part, semi-annually, on each first day of July and first day of January, or whenever thereafter it shall be demanded, two dollars per share upon each share of its capital stock held by them, respectively, at the time of closing the transfer books as hereinafter provided; such two dollars per share being equal to eight per centum per annum on the par value of such capital stock.

"But, in order to fairly adjust the first payment so to be made by the said party of the second part under this article, with reference to the date of the taking effect of this contract and the time of making such first payment, the said party of the first part covenants and agrees that it will, on or before the thirtieth day of June, one thousand eight hundred and seventy-three, pay to the said party of the second part the sum of one hundred and eighty thousand dollars ($180,000), being equal to one dollar per share on the amount of its capital stock now outstanding, and equal to the part of eight per centum per annum thereon, that would accrue between the first day of January, one thousand eight hundred and seventy-three (when

the last dividend was paid thereon), and the first day of April, one thousand eight hundred and seventy-three (when this contract takes effect.)

"*Second.* By paying the interest on the bonds of the said party of the first part, as described in the schedule hereto annexed marked 'A,' according to the conditions of said bonds, respectively, and as such interest shall, from time to time, become due and payable and shall be demanded.

" But, in order to fairly adjust the first payment of interest, to be made by the said party of the second part, on each kind of bonds mentioned in the said schedule, with reference to the date of the taking effect of this contract, the said party of the first part covenants and agrees that it will, on or before the day on which the first interest shall, ensuing the date hereof, become due and payable on any of the bonds described in the said schedule, pay to the said party of the second part an amount equal to the amount of interest accrued in each case between the date of the last payment of interest on such bonds and the first day of April, one thousand eight hundred and seventy-three :

" It being mutually covenanted and agreed that the payments to be made under this and the previous subdivision of article first may be in the 'Consolidated Mortgage' bonds of the said party of the first part, hereinafter mentioned, which bonds, so paid to the said party of the second part, may be used by it for its own sole and separate use and benefit :

" It being further mutually covenanted and agreed that the amounts outstanding of the said capital stock, and of the said bonds described in said schedule 'A,' are subject to the provisions of the third and fourth articles hereof as to an increase of each, and as to the payments to be made by the said party of the second part upon such increase of each, if, and when made.

" *Third.* And by paying the rent agreed to be paid by the said party of the first part to the New York and Mahopac Railroad Company, according to the terms and conditions of the lease hereinbefore referred to."

At the time of the lease the authorized capital of the Har-

lem Company was ten millions of dollars, of which two millions in amount were unissued. Previous to that time it had executed a mortgage to secure the payment of twelve millions of dollars of so-called consolidated bonds, which would mature May 1st, 1900. Of these bonds a certain amount had been issued, another amount was held to replace underlying mortgages on the road and the remainder was unissued. By the terms of the agreement the unissued stock and bonds were to be turned over to the Central Company to be sold and disposed of, and the proceeds to be applied to the betterment of the railroad, including the acquisition of any new property, the title to be taken in the name of the lessor. Under these provisions all the stock and bonds were outstanding long before the present controversy. The agreement contained the following provisions with reference to the payment or extension of the mortgage bonds as they might mature, and it is their construction which has given rise to the controversy between the parties.

"*Sixth.* The said party of the second part covenants and agrees that it will pay the principal of all the bonds described in said schedule ' A ' other than the bonds therein described as ' Consolidated Mortgage, due May 1, 1900,' as they shall respectively mature and be presented for payment, and that it will, at the maturity thereof, pay the principal of the said ' Consolidated Mortgage ' bonds if, and in case, it should not be paid by the said party of the first part.

"In case of the payment thereof, or of some or any part thereof, by the said party of the first part, then, and in that event, the said party of the second part shall thereafter pay to the said party of the first part, semi-annually, on the days when interest would become due and payable on said bonds, if the time thereof had been extended, an amount equal to such interest on said bonds, or on such part of them as may have been paid by the said party of the first part, so as fairly to adjust the obligations of the said party of the second part, herein contained, as to the annual rent on the said railroad and property herein demised.

" In case, however, the said ' Consolidated Mortgage ' bonds shall be paid by the said party of the second part, the said party of the first part agrees that it will, whenever requested by the said party of the second part so to do, issue in lieu thereof new bonds bearing a similar rate of interest, or such other rate as may be agreed upon, with, so far as may be required, proper coupons or interest warrants therefor appended, and secured by a suitable mortgage upon the railroad property and franchises hereby demised; such bonds to be payable at such time or times, and to such person or persons as may be prescribed by the said party of the second part, and will deliver such new bonds to the said party of the second part, to be sold or disposed of in its discretion; in which case the obligation of the said party of the second part herein contained, with regard to the payment of interest on the said ' Consolidated Mortgage ' bonds shall be deemed and held to apply to interest on such new bonds.

" And at the maturity of such new bonds the process herein provided for shall be repeated; and so on, as often as may be necessary, during the continuance of this contract."

At all times from January 1st, 1896, till after the commencement of this action seven of the thirteen directors of the Harlem Company were also directors of the Central Company. At the end of that year the Central Company contemplated a new issue of bonds and entered into negotiations with a firm of bankers for their sale. In connection with this negotiation there arose the question as to how the consolidated mortgage bonds of the Harlem Company were to be provided for at maturity, and the tender of the bankers was in the alternative, either to purchase the issue of Central bonds covering the Harlem property or to purchase with the Central bonds, bonds of the Harlem road to replace the consolidated bonds. At this time the rate of interest had so fallen that it was found possible to sell at par new bonds bearing interest at the rate of three and a half per cent per annum. The difference in the interest charge for the twelve millions of outstanding bonds and for the new bonds to be

substituted therefor would amount to four hundred and twenty thousand dollars annually, and the question seems to have immediately arisen as to which party, the lessor or the lessee, was, under the terms of the lease, entitled to this saving. Counsel for the Central Company advised that company that the reduction in interest inured solely to its advantage; counsel advised the Harlem Company that it, by negotiating a new mortgage, could pay off the consolidated bonds and secure to itself the reduction in the interest charge. One eminent counsel took still a different view and advised the Harlem Company, which was the owner of a street surface railway line on Fourth avenue, in the city of New York, with valuable depot and station lands, that if it could raise the necessary funds by the sale of such property it might pay off the consolidated bonds and thus secure the reduction in interest charge, but that under the lease it could not execute a new mortgage on the demised property and obtain the necessary funds by that means. The Central Company instituted a suit against the Harlem Company to compel that company to issue and deliver to the Central Company under the last provision of the 7th clause of the lease, new bonds and to have it declared that the Harlem Company had not the right to pay off the consolidated mortgage bonds in its own interest or on its own behalf. Answer was interposed in that suit and it remained at issue until the final contract between the two companies. A stockholder in the Harlem Company brought an action against that company and the Central Company to secure the rights of the Harlem Company and his own. This also remained at issue. The board of directors of the two companies met from time to time and considered the question at issue between them. The directors who were common to both companies supported the claim of the particular company as the directors of which they were at the time acting; that is to say, at the meeting of the Harlem Company they asserted the claim of that company; at the meeting of the Central Company they asserted the antagonistic claim of that company.

Matters remained in this indefinite condition until June, 1898, when, at a meeting of the Harlem board of directors a committee composed of members of that board who were not directors of the Central Company, and only one of whom was a stockholder therein, was appointed to confer with a like committee on the part of the Central Company, none of whom were directors in the Harlem Company, for a settlement of the differences between the companies, and a resolution was passed that any agreement effected between the two committees should be submitted to the stockholders of the Harlem Company for their action thereon. Similar measures were taken by the board of directors of the Central Company. The two committees agreed on a compromise which, in substance, increased the dividends to be paid to the Harlem stockholders from eight per cent to ten per cent, and the Harlem Company relinquished all further claim on the Central Company. In other words, of the reduction in interest charge, amounting to four hundred and twenty thousand dollars annually, the sum of two hundred thousand was to go to the Harlem Company and two hundred and twenty thousand to the Central Company. The compromise agreement was submitted to a meeting of the Harlem stockholders held on October 5th, 1898, at which it was adopted by the vote of 146,519 shares, out of 157,561 shares participating at the meeting and a total of 200,000 shares outstanding. The agreement was also ratified by a meeting of the Central Company stockholders. Despite of this ratification the directors and officers of the Harlem Company failed to execute the compromise agreement until April, 1900, when they demanded that the Central Company indemnify them for their action. Such indemnity being given they executed the contract. The suit between the two companies was discontinued as was also the suit brought by the stockholder of the Harlem Company. To obtain a discontinuance of the latter suit the Central railroad paid to the plaintiff therein two hundred shares of Harlem stock. On June 29th, 1900, the plaintiff instituted this action, praying as relief that the compromise

agreement be adjudged void, and that by the payment of the consolidated mortgage bonds by the Harlem Company, that company was entitled to receive the full rent reserved in the lease, being the sum of $840,000, the equivalent of 7% interest on twelve millions of the consolidated bonds. ·The action was referred to the Honorable Charles Andrews to hear and determine. After a trial, in which most of the evidence consisted of stipulated facts, the learned referee decided in favor of the defendants. The judgment entered on the report of the referee was unanimously affirmed by the Appellate Division of the first department, and from the judgment of the Appellate Division this appeal is taken.

The distinguished jurist before whom, as referee, this case was tried, was of the opinion that by the terms of the original lease the Harlem Company was entitled, if it could procure the necessary funds, to pay off the consolidated mortgage bonds and thus secure to itself any advantage in the reduction in the interest charged on its road. We think that in this view he was clearly right. By the first clause of the lease all payments to be made by the lessee were reserved as rent and by the second subdivision of the clause that rent was to be paid by paying certain specific interest charged to the holder of the bonds. This provision did not change the character of the payment, but merely the method of the payment. The payment was still to be of rent. By the second paragraph of the sixth clause it was expressly provided that in case of the payment of the bonds or any of them by the lessor, the lessee was to pay the lessor semi-annually, on the dates when interest would become due and payable, an amount equal to the interest thereon or such part as might have been paid by the lessor " so as fairly to adjust the obligation of the said party of the second part (Central Company) herein contained, as to the annual rent on the said railroad and property herein demised." In the written opinion given to the Central Company by its counsel it is merely stated that the requirement of the lease that the lessee should pay the interest on the outstanding bonds issued by the lessor was one of indemnity only. Not a reason

is given nor a word stated in support of such a claim.   It is in
direct contravention of the terms of the lease which declare
the amount of such interest to be rent and make provision for
the contingency of the payment, by the Harlem Company, of
the bonds.   It is contended, however, that as by the fifth clause
of the lease the Harlem Company covenanted and agreed that it
would not, during the continuance thereof, "authorize, create
or issue any stock or bonds additional to the amounts thereof
respectively, now authorized or outstanding, as hereinbefore
stated," the company could not issue new bonds to raise funds
wherewith to pay off the old bonds.   The language of the
lease does not justify any such construction.   The covenant
is not to refrain from issuing any bonds other than those out-
standing at the time of the lease and specified in the schedule,
but not to issue bonds "additional to the amounts" then out-
standing.   New bonds issued in substitution of the old bonds
would not in any respect increase the amount outstanding.
There is this further answer to be made to the claim of the Cen-
tral Company.   As held by the learned referee, any new mort-
gage bonds issued by the Harlem company without the consent
of the Central Company, would be subject to the lease held
by the Central Company, and that company, therefore, had no
legal interest in the question whether the Harlem Company
should mortgage its reversion or not.   If the covenant is sub-
ject to the construction contended for by the Central Com-
pany it would be void and could not be enforced.   Ever since
the decision in *De Peyster* v. *Michael* (6 N. Y. 467) it has
been the settled law in this state that a covenant restraining
alienation by the owner of the property in fee is void, and that
such a covenant can be supported only where the covenantee
has a reversion in the property.   The Central Company had
no reversion in the demised property, but solely the demised
term.   It was said by Chief Judge Ruggles in the case cited :
"By the old feudal law the tenant could not alien his fee
without the lord's license, and the lord could not alien his
seignory without the tenant's attornment.   *   *   *   The
feudal restraint was mutual ; but when the feudal relation

between the parties was broken up, these feudal restraints were thereby dissolved, and the common-law principle applicable to property not feudal immediately took effect, and rendered similar restraints created by contract entirely void." But though in the original dispute between the two companies the Harlem Company was in the right, we further agree with the learned referee that the compromise agreement executed by the two companies in pursuance of the action of their stockholders was binding on both the parties thereto, and concluded the rights of the plaintiff.

Assuming that, the fact that the majority of the directors of the Harlem were also directors of the Central rendered the agreement made by the two boards for an apportionment of the interest reduction between the two companies voidable at the election of the Harlem stockholders, as doubtless was the case, nevertheless the agreement was not absolutely void, but could be ratified by the action of such stockholders, in which case it would become binding upon the company. The right, however, to avoid a contract made by common directors is in the corporation, not in minority stockholders. (*Burden* v. *Burden*, 159 N. Y. 287.) In that case, speaking of minority stockholders, Judge Bartlett said: "The plaintiff is in the position of all minority stockholders, who cannot interfere with the management of the corporation so long as the trustees are acting honestly and within their discretionary powers." As already stated, it was so ratified by an overwhelming majority, and the ratification is conclusive upon the parties unless the action of the majority of the stockholders was dictated by fraud or was procured by concealment and in ignorance of the true state of the facts. We concede to its fullest extent the rule which " requires of the majority of the stockholders the utmost good faith in the control and management of the corporation, and in this respect the majority stand in much the same attitude towards the minority that directors stand towards all the stockholders." (2 Cook Stock and Stockholders, sec. 662.) The safety of corporate investments depends on the maintenance of this principle in its fullest

integrity.   It was expressly affirmed by this court in *Farmers'
Loan and Trust Company* v. *N. Y. & Northern Railway
Company* (150 N. Y. 410).   The difficulty, however, with the
appellant's contention on this appeal is that the referee has
affirmatively found that the dispute between the two com-
panies was an honest one and was in good faith compromised,
and "that there was no combination, conspiracy and no fraud."
It is insisted for the respondents that these findings, having
been unanimously affirmed by the Appellate Division, are
conclusive upon this court.   To this the appellant responds
that the facts having been stipulated by the parties on the
trial, this court is bound to accept and consider them, despite
of any findings made by the trial court.   It may be that the
appellant's position is correct so far as the parties may have
stipulated the existence of any issuable or traversable facts,
and that the stipulation of the parties should be treated as
supplementing or qualifying the pleadings, and thus narrow-
ing the issues to be determined by the trial court.   For illus-
tration, in an action against an indorser on a promissory note
the answer might deny demand and notice of protest.   If on
the trial the parties stipulated the existence of facts which, as
a matter of law, constituted due demand and notice, it may
very well be that a finding by the trial court that no notice of
protest had been given would not be conclusive on this court,
even though unanimously affirmed by the Appellate Division.
But this principle cannot apply to what we may term merely
evidentiary facts ; that is to say, facts which it is not necessary
to allege or plead, but constitute only evidence from which
the issuable or traversable facts can be determined.   We think
that most, if not all, of the stipulated facts on which the appel-
lant relies are of the latter character.   However, we shall
not attempt to differentiate, as we are of opinion that, con-
sidering all of them, they fail to establish fraud or misconduct
on the part either of the directors or of the majority of the
stockholders.

The learned counsel for the appellant lays stress on the incon-
sistent attitudes which the common directors of the two com-

panies at all times assumed. In the Harlem board they asserted the rights of that company; in the Central board, the rights of that company. We see no impropriety in this course of conduct. On the contrary, it seems to us to have been the right thing for these directors to do. They were large stockholders of each company, though as appears by the finding of the referee and by the stipulation of the parties showing the respective holdings of the common directors in each company, the pecuniary interest of those directors in the Harlem Company far exceeded, so far as the disposition of the controversy in suit is involved, their interest in the Central Company. They adopted the proper method to adjust the dispute when a committee was appointed from each board of directors, who had no interest in the other company, to negotiate a settlement and to submit that settlement to the stockholders of the companies. We do not think that the existence of this dispute necessarily required them to resign from either or both boards, for they had large interests of their own to protect which might be affected by many other matters than this particular controversy. It appears also that at all times a large majority of the stock of the Harlem Company was held by persons other that the directors, who could at any time choose another board if dissatisfied with the existing one. It is contended that the circular issued to the stockholders calling the meeting to act on the proposed compromise was misleading and insufficient. Of course, any circular that might have been issued would be subject to some criticism. Minds differ, and one person would suggest one change, one another. Not a single stockholder that voted for the ratification of the compromise has complained that he was in any way misled or has sought to repudiate his action. The controversy was of long duration and of some public discussion. As early as December, 1896, or nearly two years before the stockholders' meeting, the eminent counsel for the plaintiff, Mr. Trull, in an elaborate opinion, which is found in the case, had advised that company that the claim of the Central Railroad was without foundation and that the Harlem Com-

pany and its stockholders were entitled to the reduction in the interest charges on the road. The plaintiff at all times knew the exact situation of the controversy, and if it had any fears as to its co-stockholders being misled it could have apprised them of the true state of the case, if it deemed the circular insufficient in any respect. As already stated, out of a total of 200,000 shares ($50 each), 157,561 were voted at the stockholders' meeting. Of these 146,519 were cast in favor of the compromise, and 11,042 against it. Of the 42,439 shares not voted, all but 11,653 shares have for years accepted the terms of the compromise. The common directors of the Harlem and of the Central Companies held 58,936 shares, which were cast for the compromise. If these are thrown out, nearly a hundred thousand shares would remain in favor of the compromise, or nine times the adverse vote. A computation based on their respective holdings in the two companies shows that all of such directors, with one exception, lost by the acceptance of the proposed compromise, of course, on the assumption that the Harlem claim was well founded. Cornelius Vanderbilt, the president, held 39,668 shares and William K. Vanderbilt 18,718 shares. The net annual loss of the former was $40,224.80 ; of the latter, $10,029.80, he having greater holdings than the other in the Central Company. The holdings of the other common directors are comparatively small, still, all but one lost. The annual profit to the single director who was benefited by the compromise was $440. In the light of this showing it seems to us idle to argue that the action of the common directors or of the majority of stockholders was fraudulent or intended to subserve any interest except that which they held as stockholders in the Harlem Company. The Harlem Company gave up what, from our point of view, was a very good claim for somewhat less than half its amount. The action of the directors and of the majority of the stockholders may have been foolish and timorous, but in the light of the facts narrated, certainly, dishonest it was not. If in settling this dispute their action was dictated by excessive

16

timidity or caution, still they were acting within their rights on a matter the ultimate determination of which rested in their discretion, and so long as exercised honestly, in good faith, with their determination so made, whether wisely or foolishly, the courts cannot interfere.

Two claims of the appellants remain to be noticed. It is urged that the settlement of the Harlem stockholders' suit by the Central Company, already mentioned, establishes fraud. We think not; though that settlement and the execution of the indemnity bond exacted by the Harlem directors does show that the parties were very fearful of litigation. It was, doubtless, to such timidity that the settlement of the Harlem stockholder, Mr. Hitchcock, was due. It is entirely possible that had the plaintiffs been equally prompt and instituted a suit before the compromise was adopted and executed they might also have secured a settlement of their claim. *Second.* It is urged that the compromise agreement was in effect a new lease modifying the provision for rent reserved in the old lease, and that not sufficient in amount of the Central stockholders voted for its adoption to render the agreement valid in law as a lease. We concede that a modification of a lease must be executed with the same formalities and with the same vote as required by statute in the case of an original lease. But we think that the vote of the Central Company's stockholders was sufficient. Under chapter 433 of the Laws of 1893, the only requirement is that two-thirds of the stock voted upon at the meeting shall be cast in favor of the lease.

The judgment appealed from should be affirmed, with costs.

O'Brien, Edward T. Bartlett, Vann, Willard Bartlett and Chase, JJ. concur; Haight, J., not voting.

Judgment affirmed.