(81 Misc. Rep. 685.)

### WARNER v. MORGAN et al.

(Supreme Court, Special Term, New York County. July, 1913.)

1. CORPORATIONS (§ 285*)—CONTRACTS—VALIDITY—EMPLOYMENT OF GENERAL MANAGER.

Where the by-laws of a corporation authorized the directors to appoint such agents and employés as they deemed necessary and to fix their salaries and regulate their powers and duties, a contract made by the corporation for the services of a general agent to continue for ten years, if he should live and not be disabled, which services would be of great value to the corporation, was not ultra vires.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1236–1239; Dec. Dig. § 285.*]

2. CORPORATIONS (§ 393*)—DISCRETIONARY ACTS—REVIEW BY COURT.

The discretionary exercise of corporate powers by a majority of the stockholders of a corporation in the execution of a contract which is not ultra vires nor a fraud on the minority stockholders is not reviewable by the courts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1574, 1575; Dec. Dig. § 393.*]

3. CORPORATIONS (§ 189*)—CONTRACTS—RIGHT TO EQUITABLE RELIEF.

Where, in a stockholder's action to set aside a contract, approved by vote of the stockholders, by which the corporation employed a general agent, the petition did not allege fraud or dishonesty, plaintiff was not entitled to equitable relief.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. § 189.*]

4. CORPORATIONS (§ 189*)—ACTION BY STOCKHOLDER—LACHES.

Where, in a stockholder's action to set aside a contract by which the corporation employed a general agent, it appeared that plaintiff had notice of the contract before its ratification by the stockholders and that he delayed nearly two years and accepted dividends which had been greatly increased through services rendered under the contract, the action was barred by laches.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. § 189.*]

Action by James Harold Warner against Edwin D. Morgan and another to set aside contracts and for an accounting. Judgment for defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Richard Krause, of New York City, for plaintiff.

William W. Cook, of New York City (R. H. Overbaugh, of New York City, of counsel), for defendant Morgan.

Henry W. Hardon, of New York City (Charles F. Brown, of New York City, of counsel), for defendant Corralities Co.

GOFF, J.   This is an action by a stockholder of defendant Corralities Company on behalf of himself and all the other stockholders of the said company who did not consent to the making of either of two contracts between defendants, the Corralities Company and Edwin D. Morgan, dated, respectively, December 7, 1910, and May 8, 1911, to set the said contracts aside and for an accounting by the defendant Edwin D. Morgan of the sums of money which he has received under the said contracts.

In 1900 Mr. Morgan became president of the Corralities Company, a Colorado corporation organized for raising cattle, and continued as such until December 7, 1910, when he resigned and the contract which is the subject of this action was made.   When Mr. Morgan became president, the property of the company consisted of an uninclosed tract of land of about 900,000 acres in Chihuahua, Mexico, unproductive, poorly watered, and with an inferior breed of Mexican cattle.   The company had a bonded indebtedness of $200,000, drawing interest at 8 per cent. per annum, upon which no interest had been paid, and its interest payment on current loans exceeded its annual profits from its business.   During Mr. Morgan's administration the whole ranch was inclosed by a wire fence, numerous wells were driven, the grade of the cattle was improved at least 300 per cent., about 150,000 acres were irrigated, and all these improvements were paid for out of the receipts derived from the sale of cattle, and the corporation's indebtedness was not increased.   The bonded debt was refunded and the holders of the old bonds with accrued interest exchanged them for new bonds bearing 4 per cent. interest, payable out of the income to be derived from the property.   In 1910 the property was put upon a dividend paying basis, and in 1910, 1911, and 1912 dividends of 2 per cent., 6 per cent., and 6 per cent., respectively, were distributed.   It is not denied that during Mr. Morgan's presidency the value of the property was greatly increased.

Upon Mr. Morgan's resignation as president on December 7, 1910, in order to retain his services the stockholders approved on April 11, 1911, at the annual meeting of the company, of a contract executed on the date of his resignation, which provided in substance that Mr. Morgan agreed to serve as general agent of the corporation for ten years, beginning with the year 1911, his duties to be substantially the same as those performed by him as president; and the company agreed to pay him (a) 15 per cent. for the first year and 7½ per cent. for the remaining 9 years of the gross receipts of the company from the sale of live stock; and (b) 10 per cent. of the price at which the whole or any part of the properties of the company should be sold, if sold during said 10 years, and, in case of no sale or only a partial sale being made during 10 years, 10 per cent. of the appraised value of the properties and

any addition or improvements thereto, and it was stipulated that if no sales were made the appraised value of the property should be $2,000,-000, and that in case of his death, resignation, or incapacity that said 10 per cent., or $200,000, should be paid to Mr. Morgan or his estate at the time of such death, resignation, or incapacity; and (c) 7½ per cent. of the gross receipts of the company from the sale of farm products, to be paid only, however, in case the receipts from such sale exceeded the cost thereof and 15 per cent. in addition. This contract was modified by a contract executed May 8, 1911, and approved by the stockholders at the annual meeting on April 9, 1912, as follows:

(a) As to the commission to be paid upon the sales of live stock, it provided:

"That in any of said years, when 6 per cent. is not earned or paid on the preferred stock of the company, said commission for that particular year payable to him in accordance therewith shall be only such proportion of such commission for that particular year as the dividend actually earned or paid on the said preferred stock during that year shall bear to 6 per cent., and, if no dividend is earned or paid on the preferred stock in that particular year, then no commission shall be paid to him for that particular year."

(b) In reference to the 10 per cent. commission to be paid upon the sales of the property of the company it provided:

"That said 10 per cent. commission shall not be paid to said Morgan if he resigns within two years from the date of this agreement; and provided further that in case he shall resign at any time between December 7, 1912, and December 7, 1915, then said Morgan shall be paid such proportion of said 10 per cent. commission as the period from the date of this contract to the date of his resignation shall bear to the period of ten years."

The plaintiff claims that this amended contract is ultra vires and unfair. It is not alleged in the complaint that the contract is fraudulent nor collusive nor ultra vires, but by amendment on the trial the plaintiff was permitted to add an allegation of ultra vires. The plaintiff's contentions cannot be sustained.

[1] In the first place the contract was plainly within the powers of the corporation. A corporation which must act through agents has power to employ a general manager. That it may agree to pay him for his services is too clear for argument. Article 3 of the by-laws of the Corralities Company provides that:

"The directors shall have power to appoint such agents and employés of the company as they may deem necessary, and to fix their salaries and regulate other powers and duties."

The plaintiff bases his argument on the assertion that the provision in Mr. Morgan's contract for the bonus of 10 per cent. on the value of the property is a "gratuity" and a "gift" of the corporation's money and relies on the case of Beers v. New York Life Ins. Co., 66 Hun, 75, 20 N. Y. Supp. 788. In that case an action was brought by the former president of the defendant to recover the first quarterly payment of a salary agreed to be paid him under a contract executed at the direction of the company's board of trustees. The plaintiff for many years prior to February 10, 1892, had been president of the defendant company. At a meeting of the board of trustees held on February 8, 1892, at which meeting the board accepted his resignation as president, to

take effect on February 10, 1892, the board authorized an agreement whereby his services in an advisory capacity were to be secured during the remainder of his life upon half pay, viz., at an annual salary of $37,500. Such a contract was made, but the contract, so far as the plaintiff was concerned, was "so far as strength and health might permit," and it should be particularly noticed that all the negotiations leading up to the contract were permeated with the idea that the contract was based upon past services, and the very recitals of the contract itself contain the words, "a proper recognition of such services." This contract was held ultra vires. But the Beers Case is obviously different from that at bar. In the Beers Case the corporation was attempting to provide a salary for a retiring president, not for services to be continued as president, but for such services as might be required, if any. The contract did not depend upon Beers' ability to render any service to the company. The payment to Beers, therefore, was not in consideration for services and was a mere "gift" or "gratuity" and ultra vires. But in the case at bar the corporation is contracting for the services of a general agent to continue for ten years, if he lives and is not disabled. The services to be rendered are of a character which, according to the conceded experience of upward of two years, will be of great value to the corporation. There is nothing in the record to show that Mr. Morgan's compensation was designed as remuneration for past services. The plaintiff argues that the payment on Mr. Morgan's death or incapacity might have been made at any time after January 1, 1911, when the contract took effect, and thus before he had rendered any service. That is true. But it is true of all contracts for hiring when part of the consideration is the insurance of the employé against death or incapacity. The same result attends the common type of contract providing for the payment of a cash or stock bonus to an employé upon entering upon his employment. No case has been found suggesting that compensation of either sort, as part of the consideration to be paid by the employer, is ultra vires. While it is true that on January 1, 1911, the $200,000 might have become payable to Mr. Morgan's estate in case of his death or incapacity on that day, he is now, after a lapse of two years and a half, still living and rendering services to the company, and the plaintiff's contention has become a mere moot point. So also as to the plaintiff's contention that Mr. Morgan might resign at the end of five years and then be entitled to $200,000, just as much as though he continued his services for the full ten years under the contract; that time has not arrived and the event has not occurred. Even if there be merit in this contention, it is prematurely brought and at present wholly academic.

[2, 3] There are a number of cases in the reports where a court has given relief to a minority stockholder complaining of the payment of what were found to be excessive salaries to corporation officers, but these generally were cases either where salaries had been fixed by directors only, without the approval of stockholders, or where salaries had been fixed with the *fraudulent* purpose of coercing the minority by distributing profits in the form of salaries and not as dividends. Where the contract presents only the question of discretion in the ex-

ercise by stockholders of corporate powers, that question is not reviewable by the court.

In Flynn v. Brooklyn City R. R. Co., 158 N. Y. 493, on page 507, 53 N. E. 520, on page 524, the court says:

"As a general rule courts have nothing to do with the internal management of business corporations. Whatever may lawfully be done by the directors or stockholders, acting through majorities prescribed by law, must of necessity be submitted to by the minority, for corporations can be conducted upon no other basis. All questions within the scope of the corporate powers which relate to the policy of adminstration, to the expediency of proposed measures, or to the consideration of contracts, provided it is not so grossly inadequate as to be evidence of fraud, are beyond the province of the courts."

In Continental Ins. Co. v. New York & Harlem R. R., 187 N. Y. 225, 79 N. E. 1026, affirming 103 App. Div. 282, on page 301, 93 N. Y. Supp. 27, on page 39, the court below says:

"A determination by the majority is binding upon the minority of the stockholders unless there is evidence that the act complained of was ultra vires or fraudulent, so that there was an intention of all concerned, including the majority of the stockholders, to defraud the nonassenting stockholders or the corporation, and that the scheme would result in a serious injury to them or to the corporation. To justify the interference of a court of equity, the majority of the stockholders must have been parties to a fraud which would result in an injury to the corporation or the minority stockholders."

In Gamble v. Queens County Water Co., 123 N. Y. 91, on page 99, 25 N. E. 201, on page 202 (9 L. R. A. 527), the court says, by Peckham, J.:

"To warrant the interposition of the court in favor of the minority shareholders, * * * a case must be made out which plainly shows that such action (of the majority) is so far opposed to the true interests of the corporation itself * * * that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise. * * * This is no business for any court to follow."

In Colby v. Equitable Trust Co., 124 App. Div. 262, on pages 266, 267, 108 N. Y. Supp. 978, on page 981, affirmed without opinion 192 N. Y. 535, 84 N. E. 1111, the court says:

"When the plaintiff became interested in the Equitable Trust Company, he did so with full knowledge of the fact that the statute commits to the majority stockholders the right to select its officers, dictate its policy, and control its management. If the acts of the majority do not meet with his approval, he has no legal ground of complaint unless he can show facts which, in effect, amount to a fraud against him or bad faith on the part of the majority. A court of equity will interfere in the management of a corporation at the solicitation of a minority stockholder only when his complaint is based upon some illegal or unauthorized act of the majority to his prejudice."

In Leslie v. Lorillard, 110 N. Y. 519, on page 532, 18 N. E. 363, on page 365 (1 L. R. A. 456), the court says:

"In actions by stockholders, which assail the acts of their directors or trustees, courts will not interfere unless the powers have been illegally or unconscientiously executed, or unless it be made to appear that the acts were fraudulent or collusive and destructive of the rights of the stockholders.

Mere errors of judgment are not sufficient as grounds for equity interference. for the powers of those intrusted with corporate management are largely discretionary."

In Schwab v. Potter Co., 129 App. Div. 36, on page 40, 113 N. Y. Supp. 439, on page 442, the court says:

"It is beyond controversy that an act clearly within the powers of the board of directors of a corporation and of the majority of its stockholders will not be interfered with, in the absence of fraud, for the business of the corporation must be conducted by itself and not by the courts."

In the case at bar the plaintiff does not allege fraud or dishonesty and in his argument expressly disclaimed any such charge. There is. therefore, in the light of the authorities, no ground for equity to interfere.

For services now continuing about two years and a half, Mr. Morgan has received about $32,000. Due to the Mexican disorders it has become problematical whether he will receive much, if any, current salary during the remainder of his ten years of service. It may turn out that his only other compensation will be $200,000 at the end of ten years, the equivalent of about $125,000, present value, if paid in a lump sum when the contract began. And it cannot reasonably be claimed upon all the evidence of Mr. Morgan's services to the company and his acknowledged success and ability in handling its affairs that such compensation is excessive. This court is of the opinion that the interest of all the stockholders, including the plaintiff, requires that the contract herein questioned should be sustained. The contract is exceptionally favorable to the company, since it relieves it from the payment to Mr. Morgan for current services except out of current profits remaining after payment of interest and dividends.

[4] Finally the plaintiff's laches should be a bar to this action. The original contract, since modified to the advantage of the company and the stockholders, took effect January 1, 1911. The plaintiff had notice of it before it was ratified by the stockholders at their meeting in April, 1911. So long as the company paid dividends under Mr. Morgan's management, the plaintiff contentedly received them. The action was not begun until December 5, 1912, and after the revolution in Mexico had made the payment of dividends inexpedient. In other words, this action was delayed until Mr. Morgan had rendered services for nearly two years under the contract, had admittedly through his efforts added greatly to the value of the company's property, and after the position of all the parties to this action had become materially changed. Having notice of the contract, it was the plaintiff's duty to act promptly if he believed that he was aggrieved. Vigilantibus non dormientibus æquitas subvenit.

Judgment for the defendants, dismissing the complaint, with costs to each defendant.

Judgment for defendants, with costs.