THE PEOPLE'S TRUST COMPANY, as Trustee under the Will of
MAURICE O'MEARA, Deceased, Suing on Behalf of Itself and
All Other Stockholders of MAURICE O'MEARA COMPANY, Appel-
lant, Respondent, *v.* WILLIAM O'MEARA and Others, Respondents,
Appellants, Impleaded with MAURICE O'MEARA COMPANY,
Defendant.

Second Department, December 22, 1922.

Corporations — action to recover money illegally paid to directors as
salaries and to compel distribution thereof as dividends — trustee
holding stock cannot consent to payment of salaries illegally voted —
trustee not estopped by any consent given — amount of illegal salaries
recovered should be paid out as dividends — trust estate entitled to
its share less any sum previously paid by other stockholders to trustee
in consideration of alleged consent by trustee to illegal salaries —
directors entitled to reasonable compensation for services outside of
official duties.

A trustee holding capital stock of a corporation with directions to collect and
pay over the dividends to the beneficiary cannot consent to the payment
of salaries to the directors which are illegally voted, and his consent to such
illegal disposition of the profits of the corporation is not rendered valid by the
fact that the other shareholders paid over to the trust estate a small share of
the profits illegally received by them as directors.

Accordingly, a trustee is not estopped, by any consent given for the illegal dis-
tribution of profits, to bring an action against the directors and the corporation
to compel the repayment of moneys illegally paid to the directors as salaries
and to compel the distribution, as dividends, of the moneys so recovered.

The trust estate is entitled to receive its proportionate share of the moneys illegally
diverted, after payment of preferred dividends, less the amount paid to the
trustee by the other shareholders in consideration of his consent to the payment
of salaries.

Furthermore, there should be deducted from the amount alleged to have been
illegally paid to the directors for salaries such a sum as will represent the reason-
able value of the services of the directors for work performed by them outside
the scope of their official duties.

KELBY and KELLY, JJ., dissent, with opinion.

CROSS-APPEALS by the plaintiff, The People's Trust Company,
and by the defendants, William O'Meara and others, from a
judgment of the Supreme Court, entered in the office of the clerk
of the county of Kings on the 15th day of February, 1922, upon
the report of a referee appointed to hear and determine.

The said defendants appeal from the entire judgment. The
plaintiff appeals from so much of the judgment as refuses to award
an allowance for the prosecution of the action, and to declare a
lien to the extent of such allowance, upon the moneys ordered to
be restored by the individual defendants; also from so much of the
judgment as refuses to order the individual defendants as directors

of the defendant corporation to pay out and distribute the surplus of said corporation in the form of a stock or cash dividend payable to the holders of the common stock; and also from so much of the judgment as refuses adequately to protect, by injunction and otherwise, the rights and interests of the plaintiff as a minority stockholder of said corporation and as the prosecutor of this action. The corporation defendant joins in neither appeal.

The action was brought to compel the individual defendants, as directors of the corporate defendant, to account to the latter, to restore so much of the earnings of the corporation received by them as salaries as should be found to be in excess of reasonable compensation for actual services rendered, and to meet and declare and pay dividends therefrom.

*Paul Bonynge,* for the plaintiff.

*Clarence J. Shearn* [*Charles H. Tuttle* with him on the brief], for the defendants William O'Meara and others.

PER CURIAM:

There is no attempt here to combine the rights of the *cestui que trust* with those of the corporation, nor to enforce the trust contained in the O'Meara will in an action brought to enforce the rights of the corporation. The form of the action is quite plain; it is to recover from the defendant directors sums illegally voted and paid to themselves as salaries, and so still belonging to the corporation and recoverable by it; and the prayer of the complaint, among other things, asks for the distribution of these illegal salaries as dividends to the stockholders. (See Civ. Prac. Act, § 258, subd. 9.) The agreement between the defendants and the trustees to pay the trust estate $7,500 yearly instead of dividends. is alleged in the answer as a bar to the maintenance of the action. It became essential, therefore, that its validity be determined because, if valid, it created an estoppel; if not, it did not constitute a bar to any relief to which the plaintiff might show itself entitled. It seems clear that the voting of these salaries was simply, as the referee held, a method of distributing the earnings of the company. Each stockholder was, therefore, entitled to his or her proportionate share, unless the trust estate was estopped to question the agreement by which it received less. Ordinarily, where all the stockholders of a corporation consent and where the rights of creditors are not involved nor the limits of the corporate charter exceeded, any action of the corporation with reference to its property, surplus or assets, may be sustained, although not in accord with the general methods of corporate action. Here all the stockholders, including plaintiff's predecessors, consented in form

to the salaries voted and paid to the directors by themselves. But the trustees holding capital stock with directions to collect and pay the dividends to the beneficiary, could not, in consideration of the payment to the trust estate by the other three shareholders of a small share of these profits in place of an equitable distribution thereof, surrender to them the right to take the profits of the corporation in lieu of salaries without any regard to the value of their services. The defendants O'Meara were chargeable with knowledge of this limitation upon the trustees' right. Such consent was, therefore, void and did not constitute a ratification of the illegal acts of the directors, nor create any estoppel upon the trustee to assert the right of the estate to its proportionate share of the corporate earnings. The referee was authorized to direct distribution of these so-called salaries when restored to the corporation as dividends. Earnings of the corporation have been distributed in the guise of salaries and such distribution has been unequal and disproportionate to the several stockholders. The judgment simply requires the directors to do what they should have done, namely, distribute such earnings as a dividend, so that each stockholder shall receive his or her proportionate share.

The judgment, however, should be modified. According to its present provision, the salaries to be restored are $1,136,300, less amount paid trust estate, $82,500, leaving the net amount to be restored, $1,053,800; from this must be deducted the preferred dividends, $13,813, and the balance, $1,039,987, must be divided into fourths, and each of the stockholders, including the trust estate, will be entitled to one of these equal fourths, or $259,997.

But the trust estate has, pursuant to the agreement declared void, already received $82,500, which added to the above one-fourth of the balance directed to be distributed will make a total of $342,497 to be received by the trust estate. In other words, the trust estate receives an excess of $82,500, over and above the amount received by the stockholders. This, of course, is inequitable. The judgment should provide that the illegal salaries be restored to the company, $1,136,300, from which must first be paid the preferred dividends, $13,813, leaving $1,122,487 to be divided into fourths, amounting to $280,621.75; from one of these fourths to be paid to the trust estate should be deducted the amount received by the estate under the illegal agreement, $82,500, leaving the share to be paid such estate $198,121.75.

The $82,500 should then be distributed among the defendants O'Meara equally. In this way equality of distribution is secured.

The above computation points out the proper method of distribution. The final figures, however, will be different, because

the judgment requires a further modification. The defendants should be allowed reasonable compensation for the services performed by them outside of their official duties (*Fox* v. *Arctic Placer Mining & Milling Co.*, 229 N. Y. 124), which concededly were important and valuable to the corporation. The case should, therefore, be remitted to the referee to take proof and determine the amount to be allowed for such compensation. The amounts to be restored and distributed in accordance with the above method of computation will, therefore, be proportionately reduced.

The judgment should be modified so as to provide that the amounts of illegal salaries paid the individual defendants which are to be restored to the corporation shall be the amounts paid said defendants as salaries, with interest, less such amounts as may be found to be a fair and reasonable compensation to said defendants for their services to said corporation outside of their official duties, with interest, and the case should be remitted to the referee to make such findings. And the judgment should be further modified to provide that said defendants meet as directors and after deducting from said amount so restored the eight per cent dividend on the preferred stock as in said judgment provided, they pay and distribute to each of the holders of the common stock, viz., plaintiff and said individual defendants, one equal fourth part of the balance of said moneys, deducting from the plaintiff's share thereof the amounts paid by said individual defendants under the illegal agreement to plaintiff's predecessors as trustees, with interest, and that said last named amounts be equally divided among and paid to said individual defendants, and as so modified affirmed, without costs.

New findings and conclusions are directed to be made by the referee in accordance with the order to be entered upon this decision, and new final judgment upon the present record and the said new findings and conclusions shall be entered as a substitute for the present judgment, which new judgment shall also specify the amount to be paid by each defendant, and also the amounts to be received by the parties entitled thereto. The case is remitted to the referee to proceed accordingly.

BLACKMAR, P. J., JAYCOX and YOUNG, JJ., concur; KELBY, J., dissents and reads for reversal and dismissal of the complaint, with whom KELLY, J., concurs.

KELBY, J. (dissenting):

Additional facts not referred to in the prevailing opinion are as follows:

The parties own among them the entire capital stock of the corporate defendant, deriving their interest from Maurice E.

O'Meara. He established the business in 1855. It was incorporated in 1900 with a capital stock of $100,000, of which Mr. O'Meara sometime after gave about one-third to the individual defendants, his sons. They were associated with him, and it was the practice to distribute the earnings, as salaries, in the proportion of the stock interests. Mr. O'Meara, Sr., died in January, 1910. His will gave to each of the sons enough of the stock to bring the interest of each up to one-quarter. The remaining quarter was given to John W. Eginton, his son-in-law, and William O'Meara (also his widow, who renounced), " to ˙receive * * * and * * * apply the net income, dividends and profits " to the support of his wife during her life, and, upon her death, to be divided among the sons then surviving. The income from the residue of the estate, valued at about $200,000, was given to his wife for life, with remainder to the three sons and seven daughters. The sons waived their interests in the daughters' favor. Mr. Eginton, who with the widow's consent was active in her interest, let the sons know that he desired some provision for the payment to her of some regular sum annually, so as to enable her to live in her accustomed comfort without worrying about dividends. The income of Mr. O'Meara, as salary, which in 1909 had been about $16,400, had ceased, and she was dependent upon the income from the residue, which ranged between $4,000 and $5,000, and such dividend as might be paid on the quarter stock interest. The condition of the company was not promising. It owed the estate of O'Meara, Sr., about $70,000, moneys left with it by Mr. O'Meara; the capital was impaired about $50,000; there were about $18,000 in doubtful accounts, and the banks were frowning on loans. Mr. Eginton said to one Walker that to talk about dividends in this condition was a joke; that he had the whip hand over the sons by reason of holding the corporation's note, with the sons' indorsement, for the $71,000, and that they would have to do as he said because he could shut down on them at any time. He proposed, that since the mother was old — between seventy-one and seventy-two — and could not draw a salary directly, the sons should each agree to contribute, out of their salaries, one-third of an annual $7,500, to be in lieu of dividends on the trust stock. Ultimately the sons agreed. The agreement was oral, but unquestionably was made, and the sons entered into it without any intent to wrong or defraud their mother. The belief of Mr. Eginton that it was in her best interest had support in the past history of the company. It had never in its history earned at a rate sufficient to permit each of the sons to draw an amount equal to that which their mother would have under the agreement, viz., thirty per cent upon the par value

of the stock. The highest previous earnings had been about $26,000. In carrying out the agreement some cash was sent each week to the mother, and each month a proportionate check, all of which was charged to the sons on the corporate books and was entered on the trust books by Mr. Eginton personally. The practice of distributing earnings as salaries was continued. During the years 1910 to 1918 these salaries were fixed at each semi-annual meeting of the directors, who were the sons, all of them voting. At the following annual stockholders' meetings the action of the directors was ratified unanimously, Mr. Eginton until his death in April, 1918, voting the trust stock affirmatively. For 1919 and 1920 the salaries were fixed only by the stockholders, in the form of resolutions that they were to continue at the rate last fixed. Each son received the same salary, though there was a difference between them in official position and business function. Between them, in each year, part of the salaries was left undrawn for use as working capital. Other working capital was procured by pledge of their personal credit. The business prospered. The debts were paid, the capital impairment repaired, good earnings realized, and a substantial surplus accumulated. In 1910 and 1911 each year's earnings were about $35,000; 1912 showed about $45,000, and during the years 1913, 1914, 1915 rose to around $70,000. In 1916 earnings were about $265,000, in 1917 about $300,000, in 1918 about the same, in 1919 about $450,000, and in 1920 about $500,000. The salaries were increased as the business grew; from $10,000 to each son in 1910, to $15,500 in 1914; $19,000 in 1915; they grew to $55,000 for 1916 and 1917, and $50,000 for 1918, 1919, 1920. In June, 1920, the peak of the corporation's war time prosperity was reached, and there was a sharp decline. Prices fell about two-thirds, sales for 1921 were but $2,297,000 against $11,237,165 for 1920, and there was a net loss of $237,000. Accounts receivable amounting to $195,000 were charged off as bad debts, of which but $60,000 was afterwards collected. Other assets proved "frozen" and the banks asked reduction of existing loans. The surplus fell to $141,555.95. Dividends on the preferred stock were passed, all salaries reduced, including the salaries of the sons, which were reduced to $40,000 and then to $30,000 and finally $15,000. About this time there developed a dissatisfaction on the part of Mrs. O'Meara with her income. She was now eighty-two years old, living in the old house with several of her daughters, who were to some extent dependent upon her. Her income of about $12,500 was exceeded by her expenses of $13,428.26 and $15,431.66 for 1919 and 1920. There was no definite complaint to the sons, and in testify-

18

ing she did not claim any lack of comfort other than that she had no automobile and the neighbors were talking about it. She denies that she knew about the $7,500 agreement, while they claim that she did. She had, however, regularly received payments at the rate fixed by the agreement, and on the trial upheld the capability and disinterestedness of Mr. Eginton. In 1911 Eginton and William O'Meara had accounted, in the Surrogate's Court, as executors, and been discharged. In 1915 they accounted as trustees. In 1918, after Eginton's death, William accounted as surviving trustee. Mrs. O'Meara personally appeared on each of these accountings, waived citation, and consented to the entry of a decree settling and allowing the account as filed. In these accounts there were charged the sums received from the sons "as per agreement," and there were credited the corresponding sums paid to Mrs. O'Meara. Decrees were duly entered on the accountings. In December, 1920, William resigned as surviving trustee, and filed a final accounting. The plaintiff was appointed trustee in his stead. It at once brought this action to secure restoration to the corporation of the sums withdrawn as salaries, which with interest amounted to about $1,250,000, and to have appropriate dividends declared. Other relief was also sought.

The referee was of opinion that the salaries should be restored, and that the resultant fund should be ordered disbursed as a dividend.

The plaintiff appeals from the denial of the further relief sought, including an accounting of the exact amount of the surplus, and award of further dividends therefrom, and from the refusal to grant to the plaintiff an allowance of the amount asked, to be secured by lien upon the recovery, in addition to the statutory extra allowance of $2,000. The individual defendants appeal generally. The corporation joins in neither appeal.

The complaint was framed in the right of the corporation to redress a wrong done it, in the nature of a waste of its assets, by the payment of the salaries. No fraud upon, or plan or intent to defraud, the corporation was alleged or found by the referee. His opinion shows that he regarded the salaries as excessive and not based upon the value of the services rendered; but his decision was not based on this consideration, but upon the fact that the salaries were a method of distributing the earnings.

Where creditors' rights are not affected, any form of distribution, however characterized, violates no right of, or obligation to, the corporation. (*Hartley* v. *Pioneer Iron Works*, 181 N. Y. 73; *Fitchett* v. *Murphy*, 46 App. Div. 181; *Kassel* v. *Empire Tinware Co.*, 178 id. 176; *Shaw* v. *Ansaldi Co., Inc.*, Id. 589.) The point of condemnation, in the referee's decision, was that the salaries

were voted retroactively, and, therefore, violated the rule that corporate officers presumptively serve without compensation, and are entitled to none, in the absence of some pre-existing provision therefor, by charter, by-law or contract. (*Palmer* v. *Scheftel*, 183 App. Div. 77; *Fox* v. *Arctic Placer Mining & Milling Co.*, 229 N. Y. 124; *Alexander* v. *Equitable Life Assur. Soc.*, 233 id. 300.) Whether this rule would affect the salaries for 1919 and 1920, which were fixed by the stockholders prospectively for each year, is a question, though it may be passed in order to directly reach the paramount question, whether the action was maintainable at all, in respect to any year's salaries.

The gist of the reasoning of the referee, whereby he sustained the action, was that the salaries, being voted retroactively by the directors to themselves as officers, were voidable; and that they were not validated by the subsequent unanimous vote of the stockholders, because one-fourth of this vote was by Eginton of the trustee stock and could have no " probative force and effect " in ratification, since to accord it such would be an effectuation of the $7,500 agreement, which was " illegal and void." The referee, therefore, found the salaries should be restored to the corporation to be at once disbursed in a decreed dividend, so that the " injustice " to Mrs. O'Meara, by the agreement, be righted.

There are several assumptions, in this reasoning, as to the law governing corporate action, which are erroneous. There is woven into one texture the distinct and diverse rights of the corporation, which are the gravamen of the complaint, and the rights of the *cestui que trust*, which are not. Failing any finding of error in the first, it assumes for the second the illegality of the $7,500 agreement, and shifts entirely to the single strand of the *cestui's* rights in the direction for the compulsory dividend. This is a result which cannot be upheld, unless we are to regard as abrogated the clear and settled distinction between actions brought for the redress of wrongs to the corporation, and actions brought for redress of wrongs to a stockholder.

The referee was appreciative of the obstacle of this distinction, and at the close of plaintiff's case felt compelled to grant a dismissal of the action; because the complaint sought the relief, appropriate only to a stockholder's direct action, of enforcing a personal right of a stockholder and the distribution of a dividend. He referred, in his opinion, to some of the cases which have declared and enforced the distinction between a derivative action, so called, because the right to maintain it is derived from the corporation, and an action upon a personal right of action accruing to the stockholder as such. He was of opinion that none of the cases

strictly held that the right to compel a distribution of earnings is personal to the stockholders, exclusive of the corporation, but recognized that *Miller* v. *Crown Perfumery Co.* (57 Misc. Rep. 383, mod. and affd., 125 App. Div. 881) " seems clearly so to hold." He was, however, of opinion that if such had been the rule, it was to be considered altered, in view of what was said in *Von Au* v. *Magenheimer* (126 App. Div. 257; affd., 196 N. Y. 510), and in view, too, of the amendment made by chapter 633 of the Laws of 1913, which added section 91a to the General Corporation Law.

As to this amendment, none of the several cases which have interpreted it have held that it effected an obliteration of the rule that a derivative action is distinct from a stockholder's personal action. These cases have consistently declared that the intent and effect of the amendment was to do away with the distinction between strict actions in equity and act'ons at law, founded upon wrongful acts of officers and directors, which before the amendment could not be united. (*German-American Coffee Co.* v. *Diehl, No. 2,* 86 Misc. Rep. 547; affd., on opinion below, 168 App. Div. 913; *German-American Coffee Co.* v. *O' Neil, No. 2,* Id. 913; affd., 216 N. Y. 726; *Sherwood* v. *Holbrook,* 98 Misc. Rep. 668; affd., 178 App. Div. 462; *Wilson* v. *Brown,* 107 Misc. Rep. 167; affd., 190 App. Div. 926.) And both in the caption of the amendment and in its text the reference is to suits " by " and " of " a corporation, which would seem in exclusion of personal actions by a stockholder.

The observation in the *Von Au* case (by Mr. Justice MILLER), cited by the referee, was that " where directors in bad faith and for purposes of their own refuse to make proper distribution of earnings, the injury is primarily to the stockholders collectively and must be redressed *through the corporation* by a suit in equity to compel proper action, and that where waste is committed the direct injury is to the corporation, and   *   *   *   the remedy is by a representative action *on behalf of the corporation.*" The italics are mine, added to bring out that the words " through the corporation " are used antithetically to cases where the remedy is by an action " on behalf of the corporation "— that is, a derivative action. It seems very clear to me that Mr. Justice MILLER had no more in his mind than a statement of the settled rule, and this further appears from the citation, immediately following, of some of the leading cases which have declared and applied it, such as *Flynn* v. *Brooklyn City R. R. Co.* (158 N. Y. 493); *Sage* v. *Culver* (147 id. 241); *Hawes* v. *Oakland* (104 U. S. 450); *Kavanaugh* v. *Commonwealth Trust Co.* (181 N. Y. 121) and *Niles* v. *N. Y. C. & H. R. R. R. Co.* (176 id. 119). Again the same judge in the Court of Appeals, in *Godley* v. *Crandall & Godley Co.* (212 N. Y. 121), sustained a personal

action by a stockholder to recover a share of earnings distributed under the guise of salaries. But Mr. Justice MILLER's meaning in the *Von Au* case is clear. What was meant by the words "through the corporation" was the actual legal result that the decree in the stockholder's personal action would be effectuated "through the corporation," acting by its directors in making the compulsory dividend. "In any event the decree of the court with respect thereto would run to the board of directors," was the more exact way Mr. Justice LAUGHLIN later expressed the same idea in a stockholder's personal action to compel the distribution of dividends. (*Nauss* v. *Nauss Brothers Co., No. 1,* 195 App. Div. 318, 327.)

If the intent of the decision in the *Von Au* case, or of, the amendment by section 91a of the General Corporation Law, was to abolish the distinction between derivative and personal actions, and to substitute therefor the idea that these causes of action may shift and interchange according to the exigencies of the situation, it has so far escaped notice in certain carefully considered cases, decided later. The courts have affirmed and applied the theory of the total distinction of the two causes of action in *Godley* v. *Crandall & Godley Co.* (*supra*); *Brock* v. *Poor* (216 N. Y. 387), which directly restated the distinction, and *Harris* v. *Pearsall* (116 Misc. Rep. 366).

In the case at bar there was no adequate or complete trial and disposition of the defenses pleaded, which might have validity against a personal action but which were immaterial on the theory of a derivative action. Had the plaintiff brought a personal action to recover the proportionate share of the sums withdrawn as salaries, the pleaded defense that there were adjudications adverse thereto, by the accounting decrees to which Mrs. O'Meara had consented, would be triable. (*Blair* v. *Cargill,* 111 App. Div. 853, 858; *Matter of Denton* v. *Sanford,* 103 N. Y. 607; *Central Trust Co.* v. *Falck,* 177 App. Div. 501; affd., *sub nom. Central Trust Co.* v. *Rogers,* 223 N. Y. 705.) Again the defense of estoppel by ratification of Eginton's votes of the trust stock might stand in bar. (*Steinway* v. *Steinway,* 2 App. Div. 301; *Bonta* v. *Gridley,* 77 id. 33.) And finally there might have been tried the broad and inclusive question, whether the action of the trustees, either under the "re-investment clause" of Mr. O'Meara's will or by virtue of Mrs. O'Meara's knowledge and acquiescence at the time and for over ten years, could be upheld as so equitable that the courts would not set it aside. (*Moss* v. *Cohen,* 158 N. Y. 240; *Barr* v. *N. Y., L. E. & W. R. R. Co.,* 125 id. 263.) This would involve also the consideration of the actuality of any feeling of injury or grievance on the part of Mrs. O'Meara, or whether her complaint

was not in truth inspired by the daughters dependent upon her and likely to profit by an enhancement of her estate.

It is suggested that the validity of the agreement was made an issue by being set up in the answer " as a bar to the maintenance of the action." The answer does not do that. None of its four separate defenses set up the agreement, in itself, as a bar. These four defenses are, *first*, the widow's knowledge and acquiescence; *second*, the adjudications by the decrees in the accountings; *third*, ratification by her and by her former trustees, and *fourth*, equitable estoppel against her by her receipt, under the agreement, for over ten years, of payments equivalent to thirty per cent upon the par value of the trust stock. And when it is perceived, as we have noted, that these defenses were treated as irrelevant to the theory of a derivative action, the suggestion fails of force. By no cause of action in the complaint, by no defense in the answer, was the validity of the agreement in issue; and the conclusion of its invalidity, as against the defenses pleaded and relevant to a personal action, is reached only by disregarding those defenses, that is to say, by assumption.

The judgment in nominal favor of the corporation, appears in truth to have been granted on the assumed strength of an unasserted cause of action in the *cestui que trust*, and is then devitalized, so far as concerns benefit to the corporation, by the compulsory dividend, which benefits only her. If this result is to stand, there has been found a device of satisfying an assumed cause of action by means of asserting another which does not exist. I do not think it can be sustained. To urge that the courts are disinclined to apply the idea of a distinct corporate identity, where to do so would impede justice, overlooks the fact that it is the plaintiff who has invoked the corporate conception by the logic of the cause of action it has advisedly elected to affirm in order to escape the trial of issues it would have to meet in a direct personal stockholder's action.

An action pursued derivatively must show a right derived from the refusal or unwillingness of the directors to sue, and must be founded upon a wrong to the corporation. (*O'Connor* v. *Virginia Passenger & Power Co.*, 184 N. Y. 46; *Continental Securities Co.* v. *Belmont*, 206 id. 7; *Brock* v. *Poor*, *supra*.) It cannot derive from a source where it does not exist. (*Waters* v. *Waters & Co.*, 201 N. Y. 184, 188.) The solution of the present case is not to be found in the assumption that the agreement was illegal or void, but in the inquiry whether any right of the corporation has been violated.

The salaries in their final form were neither void nor voidable. When based only upon the vote of the directors they were voidable (*Murray* v. *Smith*, 166 App. Div. 528; affd., on the point in question,

224 N. Y. 40), but acts of directors, which are voidable merely, stand valid unless disaffirmed by the stockholders. (*Continental Ins. Co.* v. *N. Y. & H. R. R. Co.,* 103 App. Div. 282; affd., 187 N. Y. 225; *Wallace* v. *Long Island R. R. Co.,* 12 Hun, 460; *Hyde* v. *Equitable Life Assur. Soc.,* 61 Misc. Rep. 518.) The salaries were never so disaffirmed, but on the contrary expressly ratified by the unanimous vote of the stockholders, and were thus the act of the corporation by all the means it had in law for acting. There was no invalidity in the stockholders' vote because of the knowledge, which all of them had, of the fiduciary obligation under the will. The stockholders, in or out of meeting, do not stand in a fiduciary relation to each other, but each represents his own interests only. (*Gamble* v. *Queens County Water Co.,* 123 N. Y. 91; *Socorro Mountain Mining Co.* v. *Preston,* 17 Misc. Rep. 220; *Colgate* v. *United States Leather Co.,* 73 N. J. Eq. 72; *United States Steel Corporation* v. *Hodge,* 64 id. 807, and many other authorities cited in 14 C. J. 898.) A stockholder is not disqualified from voting perforce of some private fiduciary obligation. (*Matter of Argus Co.,* 138 N. Y. 557.) " The right to vote follows the legal ownership, and the corporation has nothing to do with the equities between the owner and third persons." (*Matter of North Shore Staten Island Ferry Co.,* 63 Barb. 556, 572; *Matter of Long Island R. R. Co.,* 19 Wend. 37; *Gamble* v. *Queens County Water Co.,* 123 N. Y. 91.)

The canonical doctrine, that directors are fiduciaries, which plaintiff invokes, has in this case no application, because that fiduciary obligation is to the corporation and its *stockholders as such.* It is entirely distinct from the fiduciary obligation under the will, which may or may not have been departed from, dependent upon the result of an action wherein that question in all its equitable aspects may be properly tried. If there has been a violation of the fiduciary duty owing to Mrs. O'Meara, so that either she or her present trustee is entitled to complain of the $7,500 agreement, or to insist upon the enforcement of the trust in the strict terms of the will, or to follow funds subject to it in the hands of any one who may have improperly participated therein, *qua* trustees or *qua* directors, the limit of the right to complain is that it must be asserted in some direct or personal action and not in the guise of an action in the right of the corporation.

The complaint should be dismissed.

Kelly, J., concurs.

Judgment modified and case remitted to the referee for further findings, without costs, all in accordance with the opinion *per curiam.* Order signed.