In the Matter of the Accounting of KINGS COUNTY TRUST COMPANY, as Surviving Executor and Surviving Trustee, and W. HARRY SEFTON et al., as Executors of FRANCIS J. O'HARA, Deceased Executor and Trustee, under the Will of PHILOMENA A. CURRAN, Deceased.

Surrogate's Court, Kings County, March 20, 1953.

*Wrenn & Schmid* for surviving executor and trustee, petitioner.

*Hurley, Gray & Kearney* for executors of Francis J. O'Hara, deceased executor and trustee, petitioners.

*Nathaniel Taylor* and *James E. Birdsall* for James E. Freel and another, respondents.

*Alexander Freiser* for William Farrell and another, respondents.

*Frederick Keck* for M. C. O'Brien, Inc., respondent.

*Fred M. Ahern* for State Tax Commission.

*Charles M. Grainger* for Redemptorist Fathers of New York, respondent.

*James F. Ryan* for William L. O'Malley, respondent.

*Mudge, Stern, Williams & Tucker* for Servants of Relief for Incurable Cancer, respondent.

*Chambers, Clare & Gibson* for Missionary Society of St. Paul the Apostle in the State of New York, respondent.

*Twohy & Kelleher* for Female Institution of the Visitation, respondent.

*Judge & Collins* for Sisters of the Poor of St. Francis, respondent.

*Wright & Wright* for Lynbrook National Bank & Trust Company, respondent.

*Edward J. S. Farrell* for John J. Young, respondent, and as general guardian for Paul J. Young and another, respondents.

RUBENSTEIN, S. Testatrix died on October 29, 1945, and letters testamentary upon her estate were issued on December 7, 1945, to an individual and to a trust company, which is hereinafter referred to as the executor.

The executor accounts and credits itself with payment of a real estate brokerage fee to a corporation for services in connection with the sale of a parcel of realty upon which is erected a theatre. Objection to the allowance of such credit is interposed upon two grounds, first, that in order to minimize expenses and as part of its administrative duties, the executor's real estate department could or should have effectuated the sale; and second, that the brokerage payment was to one "closely affiliated" with it and, therefore, suspect, and a violation of the principle of undivided loyalty owed to a *cestui que trust*.

The testatrix also owned a one-family dwelling which the executor sold through its real estate department without brokerage charges therefor, and another one-family dwelling which was sold and a commission paid to a brokerage company. In addition the testatrix owned some acreage which was held in a corporate name as the testatrix' nominee, which was auctioned and a brokerage commission paid to a different brokerage corporation.

The assessed value of the theatre at testatrix' death on October 29, 1945, was $520,000, a sum which represented more than 50% of the gross estate assets. The property was leased for a term which expired on March 3, 1949, with the lessee

having the right to renew and extend the lease until March, 1954, at a reduced rental. The proof establishes that the executor's real estate department sought to dispose of this property through sources and in channels possessed of financial ability and which gave evidence of being potentially interested as investment purchasers, and through brokers whose clientele invested or speculated in specialties of the magnitude of the parcel. Those efforts were unproductive.

The sale of the theatre was effected solely through the efforts of a brokerage corporation. Its representative who conducted the negotiations was a director and majority stockholder thereof, and was also a trustee and member of the executive and trust committees of the executor. Presumably he is also a stockholder in the bank (Banking Law, § 116, subd. 4) but the extent of his stockholdings therein does not appear from the testimony. He was not, however, an officer or employee of the bank and did not receive a salary for his duties as trustee or committee member — his only compensation therefor being the fee which is paid for attendance at meetings. He is hereinafter referred to as the broker.

On behalf of his brokerage corporation the broker twice refused the request of the executor's vice-president in charge of trusts to endeavor to dispose of the property. Upon the third request he agreed to use his efforts to accomplish that result. Negotiations were then entered into by the broker with the lessee of the theatre which culminated in a purchase offer in a sum considerably in excess of the assessed and appraised values. The trust committee considered the offer at its August 27, 1946, meeting and gave power to the officers to conclude the negotiations should two other sources which had been contacted prove to be uninterested in the purchase. The latter were not interested and on August 29, 1946, the offer was accepted. Title to the property closed on December 3, 1946, payment of the entire purchase price being made in cash.

No exclusive agency for the sale of the premises was granted to any real estate broker, and the executor's trustees and members of the executive and trust committees were aware of the broker's negotiations in such capacity. There was no formal contract of brokerage employment. The broker absented himself from the August 27, 1946, committee meeting, at which the purchase offer was accepted and the brokerage thereon fixed at $12,500. Prior thereto the broker had expressed a willingness to accept on behalf of his corporation a fee slightly in excess of

that sum for its services but the corporation accepted the sum fixed. The normal brokerage for such services would have been approximately $34,500.

The executor, in keeping with its duty of full disclosure and the utmost of good faith to its *cestui que trust,* voluntarily set forth under paragraph I, Schedule H, of its account the facts in connection with the relationship of the broker to itself and to the corporation to which the brokerage fee was paid, and stated that the payment for the services was '' aside from and in excess of those required by the broker in the performance of his duties and functions as a trustee and committeeman of the trust company.'' The objectants neither complain that the sale price is inadequate nor that the brokerage fee is excessive, if it be held that the broker's relationship to the executor is not of the character which would deprive the brokerage corporation of a fee for such services. In effect it is the objectants' contention that the broker's services enured to the estate's benefit without a corresponding obiligation of payment therefor upon the estate's part.

The proposition that the executor could or should have effectuated the sale through its real estate department is sought to be sustained not by factual proof but 'solely through inference. The inference apparently being that inasmuch as the sale was made to the lessee, the same result could have been attained by the executor. Flowing from that inference is the further inference that the executor was motivated not by a desire to further the interest of its *cestui que trust,* but rather to enrich one of its trustees at the expense of the estate. Basically the objectants' contention would appear to be that the executor's real estate department's facilities were the equal of those of the broker's and similarly that the department included within its personnel persons possessed of at least equal ability, personalities and broad experiences and other human variables, which would have enabled them to gain entree to the purchaser, induce interest, negotiate and to cope with all problems as they arose and to bring to a successful conclusion the sale of a specialty of this size. No proof along those lines was offered.

There is no rule of law which imposes upon a fiduciary the obligation of using any or all of its facilities to accomplish the sale of real estate constituting an asset of the estate under administration rather than employing a broker for that purpose and to pay a proper fee therefor. The failure to employ a broker might, in some instances, be considered lack of proper

care (*Matter of Schinasi*, 277 N. Y. 252, 266). As herein stated, the executor did sell a dwelling through its real estate department, and if it had been an individual licensed as a broker no brokerage commission could be allowed as such services would have been deemed within its duties as executor for which it is compensated under section 285 of the Surrogate's Court Act (*Lent* v. *Howard*, 89 N. Y. 169, 179; *Matter of Popp*, 123 App. Div. 2, and cases cited). On the other hand, brokerage commissions were paid upon the sale of the other dwelling and the acreage, and no objections with respect thereto have been interposed.

The diversity of action and judgment exercised by the executor in connection with those sales indicate that the executor's primary purpose was to dispose of the testatrix' realty through channels which presented themselves and furthered its beneficiaries' interests. That the same motives actuated the executor in the sale of the theatre is evident from the proof adduced with respect to the efforts of the executor's real estate department to effect that result. That the executor's real estate department was unsuccessful and did not personally contact the lessee are not sufficient reasons to impute to the executor a dereliction of duty. It affirmatively appears that the executor was of the opinion that the sale could possibly be arranged through the broker's corporation. The exercise of that judgment being in good faith and having led to the sale, the court holds that there was no nonfeasance by the executor in any duty owed to the beneficiaries.

In Scott on Trusts (Vol. 3, § 326.3) the author, in discussing the liability of directors and officers of a corporate trustee to a trust beneficiary, states that there is duality of fiduciaryship by a director to the corporation and beneficiary, that his liability is solely dependent upon a dereliction of duty personally owed to the beneficiary and that the measure of the duty owed and the care and attention required in its performance is governed by the nature of his official position, which, in the case of directors generally, is responsibility " only for the general conduct of the affairs of the institution. Those directors who are members of committees or salaried officers have more extensive duties." (P. 1770.) That duty of general care and conduct of the corporate affairs is cast upon the board of directors as a body and not as individuals (*Fox* v. *Arctic Placer Mining & Milling Co.*, 229 N. Y. 124, 132). The proof adduced establishes that the broker's duties as trustee and member of the executive and trust

committees of the executor were advisory, and did not require the rendition of brokerage services by him involving the procurement of tenants or purchasers for the many parcels of realty held by the executor in its various fiduciary capacities. The advisory duties of a director are stated to be " One of the best assets of a corporation is the advice and assistance of men of business experience and of *large business connections* [italics in original] upon its board." (*Kavanaugh* v. *Gould*, 147 App. Div. 281, 289.)

No proof was tendered by the objectants that corporate fiduciaries' trustees possessed of professional or technical skills are required to gratuitously render services, outside of board or committee meetings, for the benefit either of the corporations or their trust beneficiaries. The fee paid to directors for attending at board and committee meetings, in the absence of proof to the contrary, is presumed to be for the performance of " the ordinary and usual services for such corporation such as any layman can perform without special knowledge or skill " (*Fox* v. *Arctic Placer Mining & Milling Co.*, 229 N. Y. 124, 128, *supra*).

If the theatre had been owned by the executor in its own right and it desired to effectuate the sale thereof through either the broker personally or his corporation, the contract therefor would not be void per se or voidable in the absence of fraud, bad faith or other breach of trust (*Everett* v. *Phillips*, 288 N. Y. 227, 239, 240 and cases cited). In fact the retention by the board of directors of one of its members to perform services outside the scope of his usual duties, in some instances, may be " preferable and advantageous " rather than objectionable (*Bagley* v. *Carthage, W. & S. H. R. R. Co.*, 165 N. Y. 179, 182). For services performed outside of their duties directors are entitled to reasonable compensation (*People's Trust Co.* v. *O'Meara*, 204 App. Div. 268, 271).

In the fixation of the amount of commissions to be paid, the broker observed the proprieties in not voting or participating in a matter which was affected by his private interests (*Jacobson* v. *Brooklyn Lumber Co.*, 184 N. Y. 152, 162, 163). His failure to vote gave " to the transaction the form and presumption of propriety, and requires one who would invalidate it to probe beneath the surface " (*Globe Woolen Co.* v. *Utica Gas & Elec. Co.*, 224 N. Y. 483, 489). The amount of compensation fixed and paid was considerably less than that which would have been payable upon the basis of standard brokerage rates. No

proof was adduced which established any fraud, bad faith or other irregularity in the retention of the broker's corporation or the payment of commission to it.

In *Purchase* v. *Atlantic Safe Deposit & Trust Co.* (81 N. J. Eq. 344, affd. 83 N. J. Eq. 353) the corporate trustee paid to one of its directors compensation for *disclosing* (italics supplied) a purchaser of a parcel of trust realty in the belief that the purchaser was a stranger when it was the director himself. The court stated that it was the duty of the board of directors to find a purchaser, and that a member who performed that service did no more than his plain duty, and held that the corporate trustee and director were liable for the refund of the director's compensation and the director to account and pay for all profits received in connection with the purchase. It does not appear from the opinion whether the director was a licensed real estate broker who, if the services had been legitimately performed, would have been entitled to a commission. It is stated, however, that the compensation was paid for " disclosing a purchaser "— the implication therefrom being that the director was not a broker and merely suggested the name of a possible purchaser and did not participate in the negotiations resulting in the sale. In that case the entire transaction was permeated with fraud both upon the corporate trustee and the trust beneficiary and a flagrant violation of the director's obligation of undivided loyalty to his fiduciaries. Even had no compensation been paid to the director in that case and the purchase made innocently by him, he would have been accountable for the profits under our law (*Matter of Kilmer,* 187 Misc. 121 and cases cited). That case differs, however, from the case at bar in that here the broker has in good faith and with undivided loyalty furthered the interests of the beneficiaries by the sale of the property to a stranger, and the compensation received by his corporation was for services rendered as a real estate broker, and not for profits or possible profits arising out of the purchase of the trust property by him or by persons related to or associated with him in any relationship, or involving the element of self-dealing.

*Princeton Power Co.* v. *Hardy* (103 W. Va. 329) held that a stockholder and nominal director of a corporation was entitled to retain the commissions which he had earned as a bond and investment broker in the sale of stock, and at pages 336–337 the court observed that " If a corporation could not in such a case deal with a broker who happened to be a stockholder

\* \* \* it would often be deprived of his valuable services, without his incurrence of liability to return the profits realized from a legitimate brokerage contract."

*Leathe* v. *Title Guaranty Trust Co.* (18 F. 2d 41, certiorari denied 275 U. S. 535) held that it was not improper for a broker who sold trust property to divide the commissions with another broker, who was a director of the trustee, as such payments did not prejudice the creator of the trust.

In no case cited to the court or found by it in its independent research are there present facts which are analogous to those present in this case. The objectants do not seek to set aside the sale but seek to deprive the executor of credit for the commission paid, a result which in effect would be a surcharge. The executor and the broker's corporation are not affiliated corporations, and the commissions paid are less than the market rates. The executor not having participated in the commissions, " it cannot be called to account for profits it never earned or received " (*Albright* v. *Jefferson Co. Nat. Bank,* 292 N. Y. 31, 41). The services rendered were necessary and proper and the commissions paid reasonable in amount, hence are allowed and the objections thereto overruled.

Objections to the original account were filed on January 31, 1949, by two objectants, to the failure to earn adequate income from the cash on deposit with the executor, upon which fund the executor paid interest at three-quarters of 1% per annum pursuant to the provisions of the Banking Law (§ 100-b, subd. 4). The size of the estate, the complexity of the tax and other problems involved, the necessity of retention of adequate funds for the payment of undetermined claims and for distribution purposes, as well as other factors surrounding the marshalling and administration of this estate, do not impel the conclusion that the executor abused the reasonable discretion vested in it to warrant a surcharge for failure to make other investments productive of a greater return of income (*Matter of Burroughs,* 155 Misc. 237; *Matter of Schneider,* 198 Misc. 1017, 1029).

The same objections were interposed to the supplemental account by the same parties, and were filed on June 24, 1952. An examination of the court's records discloses that from January 31, 1949, when issue was joined and the matter could have been placed on the calendar for trial and determination, the parties fifty-seven times adjourned the matter by consent until July 3, 1952, when it was finally placed upon the trial calendar. It is quite apparent that the parties were endeavoring

to amicably adjust their differences and, therefore, any failure to earn more income after issue was joined is equally attributable to the objectants as to the executor as the objectants could have forced the executor to trial. Upon all the proof, the court finds that the objectants have failed to sustain their objections with respect to failure to earn adequate income, wherefore, the said objections are dismissed.

The objections to the payments to the same broker's corporation and another broker for appraisals of the theatre property for estate tax purposes are dismissed as such fees are reasonable in amount, the services rendered necessary and not within the function of the executor's real estate department. The objection to the payment to the broker's corporation on January 14, 1947, for an appraisal of a bond and mortgage and that part of objections 3 and 4 to the four payments made to another broker for appraisals of realty and services in connection with the reduction of assessed values and the two payments to other brokerage firms for services in connection with zoning ordinances and appraisals are similarly dismissed for the same reasons.

The objections to the payments made for legal services are dismissed. Such payments are reasonable in amount, considering the size of the estate and the complexity of the problems involved. The fees so allowed, however, shall include all services to and including the entry of the decree herein and distribution thereunder.

The testatrix bequeathed the sum of $2,000 to William Farrell, an employee, and further gave him the income for life from a trust fund of $30,000, and further provided that should the income therefrom be less than $150 per month the difference was to be paid to him from principal. The testatrix' gross estate approximates $1,000,000, wherefore, the impact of estate taxes is considerably greater than would be the case in a smaller estate. That legatee beneficiary objects to the proposed allocation of taxes against his legacy and trust fund and asks that this court apply equitable principles as the testatrix intended him to receive the full benefit of the legacy and the fund.

The will is devoid of any language with respect to taxes. The court possesses no equitable power to apportion taxes so that the tax upon a legacy shall be a different or lesser percentage of the estate tax than that prescribed in the statute (*Matter of Mollenhauer*, 257 App. Div. 286). It would be " unfair to the residuary legatees to limit the contribution of the general legatees to the lowest tax bracket. Their legacies no more fall

into that bracket alone than do the residuary gifts '' (*Matter of Franciscus*, 116 N. Y. S. 2d 652, 655). The objections with respect to the allocation of taxes are, therefore, dismissed.

The objections by the general guardian of two infants not having been adopted by them after their attaining majorities on October 1, 1952, are deemed withdrawn.

The objections of William L. O'Malley, having been settled, are dismissed. No proof having been submitted the objection of John J. Young is dismissed.

Proceed accordingly.