ESTATE OF EDWIN C. WEISKOPF, DECEASED, ANNE K. WEISKOPF AND SOLOMON LITT, EXECUTORS, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7785–79.     Filed July 29, 1981.

*James B. Lewis, Marvin Wexler, Willys H. Schneider*, and *Jose E. Trias*, for the petitioner.

*David M. Brandes, Jay S. Hamelburg,* and *Stanley J. Goldberg,* for the respondent.

WILBUR, *Judge*: By notice of deficiency, respondent determined the following deficiencies in petitioner's income tax:

| Taxable year | Deficiency |
|---|---|
| 1969 | $1,365,144 |
| 1970 | 51,779 |
| 1971 | 297 |

In addition, by notice of deficiency at issue in docket No. 3837–72 (not consolidated with these proceedings) respondent determined deficiencies in petitioner's estate tax in the amount of $9,387,576.29. The parties have reached a basis of settlement with respect to the estate tax deficiency, which will result in a refund to petitioner.

Due to concessions by the parties, the sole remaining issue for our decision is whether in selling its stock in four corporations, petitioner completely terminated its interest as a shareholder so that the amounts received constitute payments in exchange for stock, or whether by virtue of the attribution rules under section 318,[1] petitioner continued as a shareholder so that the amounts received constitute dividends, taxed as ordinary income.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

The petitioner is the Estate of Edwin C. Weiskopf, deceased, represented by its executors, Anne K. Weiskopf and Solomon Litt. At the time the petition was filed, petitioner's executors resided in the State of New York.

Edwin C. Weiskopf died on February 7, 1968. He was survived by his second wife, Mrs. Weiskopf; by a son from his first marriage, Edwin C. Whitehead; and by three grandchildren, the children of Mr. Whitehead.

During his lifetime, the decedent built a business generally

---

[1]All sections references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise indicated.

known as Technicon which manufactured medical and testing machines. At the time of his death, Mr. Weiskopf owned stock in Technicon Corp., a New York corporation (Technicon U.S.); in Technicon (Ireland), Ltd., an Irish corporation (Technicon Ireland); in Technicon Equipment Property, Ltd., an Australian corporation (Technicon Australia); in Technicon International of Canada, Ltd., a Canadian corporation (Technicon Canada); and in Mediad, Inc., a New York corporation (Mediad). His stock holdings in these corporations and the ownership of the rest of the outstanding stock at the time of his death were as follows:

| Corporation | Stock owned by Mr. Weiskopf | Other shareholder |
|---|---|---|
| Technicon U.S. | 14,291 shares of cumulative nonvoting preferred stock, representing all of the outstanding preferred stock of Technicon U.S.; | Mr. Whitehead, who owned all of the outstanding common stock; |
| Technicon Ireland | 20,000 nonvoting class B ordinary shares, representing one-half of all of the outstanding stock of Technicon Ireland; | Technicon U.S., which owned all of the outstanding voting class A ordinary stock of Technicon Ireland; |
| Technicon Australia | 3,570 shares of voting common stock, representing 70% of all of the outstanding stock of Technicon Australia; | Mr. Whitehead, who owned the remaining 30% of the outstanding voting common stock of Technicon Australia; |
| Technicon Canada | 4,000 shares of cumulative nonvoting participating preferred stock, representing all of the outstanding preferred stock of Technicon Canada; | Mr. Whitehead, who owned all of the outstanding common stock of Technicon Canada; |
| Mediad | 82 shares of nonvoting preferred stock, representing all of the outstanding preferred stock of Mediad. | Mr. Whitehead, who owned all of the outstanding common stock of Mediad. |

The decedent's last will and testament, dated July 14, 1967, was admitted to probate and letters testamentary were granted to the executors on March 29, 1968, by the Surrogate's Court of New York County, N.Y. Under the terms of the will, the decedent bequeathed the 14,219 shares of Technicon U.S.

preferred stock to his three grandchildren, to be placed in a separate trust for each of them who had not reached the age of 35 at the time of his death. The decedent bequeathed the rest of his estate to trusts for the benefit of his second wife, Mrs. Weiskopf. The remaining stock owned by the decedent was subject to certain purchase and redemption agreements. The Technicon Ireland stock was subject to purchase by Technicon U.S. at book value upon death. The Technicon Canada and Mediad stock were redeemable at par plus cumulative unpaid dividends upon 30 days' notice. A memorandum initialed by the decedent and Mr. Whitehead provided that the Technicon Australia stock would be sold to Technicon U.S. at par.

On September 26, 1968, the executors distributed the Technicon U.S. preferred stock to separate trusts for the grandchildren (the trusts). Under a provision of the decedent's will, all death taxes (except with regard to certain specific bequests not relevant to this case) were to be apportioned, charged, and payable to the extent provided for by the laws of the State of New York. On December 12, 1968, the executors entered into an agreement with the trustees of the trusts (the tax apportionment agreement) fixing, in the language of the agreement, "permanently and irrevocably" the trusts' share of Federal and New York death taxes at $505,383.27, and $125,689.02, respectively, for a total of $631,072.29. These amounts were determined by calculating the trusts' share of Federal and New York estate tax liabilities based on valuations of the decedent's gross estate and of the Technicon U.S. preferred stock at the time of his death.

The tax schedules and calculations were attached to the tax apportionment agreement and were accepted by the parties for purposes of the agreement. The tax apportionment agreement was subject to the approval of the New York County Surrogate's Court. Court approval was given by a decree issued on December 30, 1968. On the same day, the trusts paid to the estate $631,072.29 in cash, as their proportionate share of estate tax. On the basis of the settlement of the estate tax proceeding, respondent and petitioner have calculated the amount of Federal and State estate taxes which would have been required of the trusts in the absence of the tax apportionment agreement to be $559,432.50.

The rest of the stock was disposed of as follows:

(1) *Technicon Ireland.*—Technicon U.S. sent a notice that it was exercising its option to purchase Technicon Ireland stock from the estate on February 27, 1968. A second notice was sent on April 8, 1968. A dispute arose between the executors and Technicon U.S. as to whether the first notice was invalid because it was issued before the executors had been duly appointed. During the time period between the first notice and the second notice, the value of the Technicon Ireland stock increased substantially. After much negotiation, the estate and Technicon U.S. decided to settle by splitting the difference in the increased value. On December 12, 1968, the executors and Technicon U.S. entered into an agreement (the settlement agreement), whereby the parties agreed to rescind the exercise of the option and to provide for a direct sale of Technicon Ireland preferred stock[2] to Technicon Ireland, or its designee, and a direct sale of Technicon Ireland class B ordinary stock to Technicon U.S. The settlement agreement, like the tax apportionment agreement, was subject to the approval of the New York County Surrogate's Court. On December 30, 1968, the Surrogate's Court issued a decree approving the settlement agreement, and authorized the executors to act in accordance with its terms. On December 31, 1968, the estate sold its Technicon Ireland preferred and class B stock as provided for in the settlement agreement.

(2) *Technicon Australia.*—During 1969, a dispute arose between Technicon U.S. and the executors as to whether the initialed memorandum concerning the sale of Technicon Australia stock at par to Technicon U.S. was legally binding. The parties settled their dispute by agreeing that the stock be sold for $40,000, the value as reported on the estate tax return. Pursuant to the agreement, the estate sold its shares of Technicon Australia to Technicon U.S. on December 9, 1969.

(3) *Technicon Canada.*—The estate sold its stock in Technicon Canada to Technicon Canada on October 1, 1969.

(4) *Mediad.*—The estate sold its stock in Mediad to Mediad on February 24, 1969.

---

[2]As part of the negotiations and settlement agreement, it was decided that Technicon Ireland would declare a preferred stock dividend on its common stock.

OPINION

At the time of his death, the decedent had substantial stock holdings in five corporations—Technicon U.S.; Technicon Ireland; Technicon Australia; Technicon Canada; and Mediad. The decedent's son, Mr. Whitehead, owned all of the remaining shares in each of the corporations, with the exception of Technicon Ireland, whose remaining shares were owned by Technicon U.S. Pursuant to the terms of the decedent's will, his 14,291 shares of Technicon U.S. preferred stock were distributed to three trusts created for the benefit of his grandchildren, the children of Mr. Whitehead. The stock of four other corporations was either redeemed or sold. The narrow issue for our decision is whether at the time of the redemptions and sales, the trusts were still "beneficiaries of the estate" for the purposes of section 318, so that stock owned directly and indirectly by the trusts is considered to be owned by the estate under section 318(a)(3)(A).

Respondent contends that at the time of the relevant sales and redemptions, the estate constructively owned sufficient stock in each corporation so that the amounts received should be taxed as ordinary income.[3] He reached this result by the following chain of attribution: stock ownership from Technicon U.S. to Mr. Whitehead, under section 318(a)(2)(C); from Mr. Whitehead to his children, under section 318(a)(1)(A)(ii); from Mr. Whitehead's children (the decedent's grandchildren) to the trusts, under section 318(a)(3)(B)(i); and from the trusts to the estate, under section 318(a)(3)(A).

Petitioner contends that at the time of the relevant sales and redemptions, the last link in the chain of attribution, that from the trusts to the estate, had been severed. Relying on section 1.318–3(a) of the Income Tax Regulations, petitioner argues that the trusts were no longer beneficiaries of the estate on December 31, 1968, the date of the first sale, because

---

[3]Respondent contends that the proceeds received from the sales of Mediad and Technicon Canada stock are taxable as dividends under sec. 302; that the proceeds from the sale of Technicon Australia stock are taxable as dividends under sec. 304; and that the proceeds from the sale of Technicon Ireland stock are taxable as dividends under secs. 304 and 306. Although different Code sections are applicable to the various transactions involved, the legal determination as to how all of the proceeds should be taxed revolves around the single and narrow issue of whether at the time of the sales, the trusts were "beneficiaries of the estate" for the purposes of sec. 318.

on September 26, 1968, the estate distributed the preferred stock to the trusts; on December 12, 1968, the estate and the trustees of the trust executed the tax apportionment agreement which irrevocably determined the trusts' liability to the estate for their share of estate taxes; and on December 30, 1968, the trusts paid the determined tax liability.

We agree with petitioners that as of the time of the sales and redemptions, the trusts were no longer considered beneficiaries of the estate for the purposes of section 318.

Section 1.318–3(a), Income Tax Regs., reads in relevant part as follows:

A person shall no longer be considered a beneficiary of an estate when all the property to which he is entitled has been received by him, when he no longer has a claim against the estate arising out of having been a beneficiary, and when there is only a remote possibility that it will be necessary for the estate to seek the return of property or to seek payment from him by contribution or otherwise to satisfy claims against the estate or expenses of administration. When, pursuant to the preceding sentence, a person ceases to be a beneficiary, stock owned by him shall not thereafter be considered owned by the estate, and stock owned by the estate shall not thereafter be considered owned by him.* * *

There is no question that all of the property to which the trusts, as beneficiaries of the estate, were entitled was distributed prior to the time of the relevant sales, and therefore the first requirement of the regulations was satisfied. Respondent argues, however, that the tax apportionment agreement executed between the estate and the trusts and the trusts' payment of their proportionate share of estate taxes did not effectively terminate the trusts' status as beneficiaries of the estate.

Respondent points to a provision in the decedent's will which directed that all death taxes were required to be apportioned, charged, and payable in the manner and to the extent provided by the laws of the State of New York. Section 2–1.8 of the New York Estates, Powers & Trusts Law provides generally for the apportionment of taxes among the beneficiaries of the estate with respect to the property distributed to them.[4] Respondent argues that since the tax apportionment

---

[4]Sec. 2–1.8, New York Estates, Powers & Trusts Law (McKinney 1977), provides in relevant part as follows:

Sec. 2–1.8 Apportionment of federal and state estate or other death taxes; fiduciary to

agreement was made prior to the filing of the estate tax returns and was made on estimates of the value of the gross estate and of Technicon U.S. preferred stock, there was more than a remote possibility as of December 31, 1968, that the Federal and State estate taxes would be adjusted when the final valuations were decided upon and that the trusts' share of the estate taxes as sanctioned by the Surrogate's Court decree would be inaccurate and subject to a supplemental determination of the court. Essentially, therefore, he argues that the tax apportionment agreement and the payment of the trusts' share of State and Federal estate taxes did not irrevocably bind the parties. Furthermore, he argues that he is not bound by the Surrogate's Court decree under *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967).[5]

We do not agree that the tax apportionment agreement did not irrevocably fix the trusts' share of their liability to the estate for estate taxes. The parties entered into prolonged negotiations with respect to the values of the Technicon preferred stock and of the gross estate. Using their best estimates, which with the benefit of hindsight were remarkably accurate, they contractually agreed to permanently determine the trusts' liability to the estate with respect to State and Federal estate taxes. This agreement was approved and sanctioned by the Surrogate's Court of New York.

---

collect taxes from property taxed and transferees thereof

(a) Whenever it appears in any appropriate action or proceeding that a fiduciary has paid or may be required to pay an estate or other death tax, under the law of this state or of any other jurisdiction, with respect to any property required to be included in the gross tax estate of a decedent under the provisions of any such law * * * the amount of the tax, except in a case where a testator otherwise directs in his will, * * * shall be equitably apportioned among the persons interested in the gross tax estate, whether residents or non-residents of this state, to whom such property is disposed of or to whom any benefit therein accrues * * * in accordance with the rules of apportionment herein set forth, and the persons benefited shall contribute the amounts apportioned against them.

\* \* \* \* \* \* \*

(c) Unless otherwise provided in the will or nontestamentary instrument:

(1) The tax shall be apportioned among the persons benefited in the proportion that the value of the property or interest received by each such person benefited bears to the total value of the property and interest received by all persons benefited, the values as finally determined in the respective tax proceedings being the values to be used as the basis for apportionment of the respective taxes.

[5]Respondent does not argue that the assets of the estate might be insufficient to satisfy the tax liability allocated to the estate and that the trusts would be called upon to contribute as transferees. Indeed, given the size of the estate and the settlement of the estate tax liability that will result in a refund, this argument would be spurious.

Certainly, the general scheme of section 2–1.8 of the New York Estates, Powers & Trusts Law contemplates an apportionment of taxes among the beneficiaries of an estate after all the values have been finally determined. Often this will be done preliminarily after the filing of the estate tax returns, and if further adjustments are made, the Surrogate's Court is authorized to make a supplemental determination to adjust the beneficiaries' underpayment or overpayment of estate taxes. See sec. 962(b)(5), N.Y. Tax Law (McKinney 1975).

However, nothing suggests that the beneficiaries themselves are powerless to apportion and irrevocably determine their liabilities with regard to the estate prior to the filing of the estate tax return or to the running of the statute of limitations after the estate tax return has been filed. Section 2–1.8 of the New York Estates, Powers & Trusts Law was designed to alter the rather harsh rule prevailing before 1930 which imposed the entire burden of the estate taxation upon the residuary beneficiaries. See Practice Commentary, N.Y. Est., Powers & Trusts sec. 2–1.8 (McKinney 1977). Although the Surrogate's Court possesses no equitable power to vary the apportionment on its own authority so as to conform with the court's notion of justice in a particular situation (see *In re Curran's Will*, 120 N.Y.S.2d 207, 203 Misc. 956 (1953) ), we see no reason why the beneficiaries and the estate may not contractually determine their liability among themselves. Compromises and settlements are frequently made between heirs and representatives of an estate regarding rights which would, in the absence of an agreement, be determined at a subsequent time either by statute or by litigation. See *In re Cook's Will*, 244 N.Y. 63, 154 N.E. 823 (1926); *Moss v. Cohen*, 158 N.Y. 240, 53 N.E. 8 (1899). Often the terms of a compromise agreement relieve particular parties from liability for estate taxes or determine the amount of taxes each of the parties is to pay. See *Steinhardt v. Steinhardt*, 192 Misc. 815, 78 N.Y.S.2d 481 (1947); Annot., 70 A.L.R.3d 691, 717 (1976). Indeed, "There has never been any question about the agreements made between the heirs or next of kin and the representatives of an estate after the death of a testator regarding settlements and compromises. These have always been held to be good, when made in good faith, and not against public policy." (*In re Cook's Will*, 244 N.Y. 63, 154 N.E. 823, 825 (1926).).

In *In re Klinke's Will*, 201 Misc. 937, 111 N.Y.S.2d 466 (1952), the testator's will was silent with regard to the payment of inheritance and estate taxes. Thus, under the statute, the taxes would be equitably apportioned among the beneficiaries, as in the case we have before us. When the will was admitted to probate, a compromise agreement had been reached among the proposed beneficiaries. One of the terms of the compromise agreement specifically provided that the estate and transfer taxes would *not* be apportioned or prorated among the parties entitled to share in the estate under the agreement. The court upheld that part of the agreement, stating, "The compromise agreement was intended to supply the direction which was lacking in the will and to make the estate taxes, which would otherwise have been allocated against the parties to such agreement in proportion to the extent they shared in the estate in accordance with the provisions of the agreement, chargeable upon the general estate." *In re Klinke's Will*, 111 N.Y.S.2d at 468. Thus, in spite of the statute which specifically provided for apportionment of estate taxes among the beneficiaries in the absence of any contrary direction in the decedent's will, the New York court upheld the beneficiaries' agreement among themselves to a different method of allocating the tax.

We think that, despite any subsequent adjustment to the gross estate or to the value of the Technicon preferred stock, the tax apportionment agreement executed between the estate and the trusts and sanctioned by the New York Surrogate's Court irrevocably and permanently determined the trusts' liability to the estate for their share of State and Federal estate taxes.[6] Thus, under the terms of section 1.318–3(a), Income Tax Regs., the trusts were not considered beneficiaries

---

[6]In this respect, *Estate of Webber v. United States*, 404 F.2d 411 (6th Cir. 1968), is clearly distinguishable. In *Webber*, only a distribution of property to the beneficiary had been made. The beneficiary and the estate had not determined the beneficiary's proportionate share of estate taxes nor had the beneficiary paid the estate any contribution for estate taxes.

Respondent also makes the argument that under *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967), he is not bound by the Surrogate's Court decree approving the tax apportionment agreement. The question, however, is whether the agreement permanently determined the liability of the trusts and the estate vis-a-vis *each other* for the trusts' share of estate taxes. For the reasons above outlined we believe that it did under New York law.

of the estate as of the time of the sales and redemptions of the various Technicon stock because all of the property to which the trusts were entitled had been received; the trusts no longer had a claim against the estate arising out of having been beneficiaries; and there was only a remote possibility that it would be necessary for the estate to seek a return of property or to seek payment from the trusts, by contribution or otherwise, to satisfy claims against the estate. Since the trusts were not beneficiaries of the estate as of the time of the sales and redemptions, there is no attribution of stock ownership under section 318 from the trusts to the estate. The sales and redemptions completely terminated the estate's interest as a shareholder in the various corporations, and the proceeds are treated as payment in exchange for stock.

To reflect the foregoing,

*Decision will be entered under Rule 155.*